# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| AMY MILLER, GARRIS GRAHAM, DAVID LUSE, BETTE LEONARD, and MIKE ARNADI, individually and on behalf of all others similarly situated,<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>GENERAL MOTORS LLC,<br><br>　　　　　　　Defendant. | Case No.:<br><br>Hon.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT WITH JURY TRIAL DEMANDED

Plaintiffs Amy Miller, Garris Graham, David Luse, Bette Leonard, and Mike Arnadi (collectively, "Plaintiffs"), individually and on behalf of the other members of the below-defined nationwide and statewide classes they respectively seek to represent (collectively, the "Class"), hereby allege against Defendant General Motors LLC ("GM" or "Defendant"), upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon investigation of counsel, as follows:

## I.   NATURE OF THE CASE

1.   This action is brought by Plaintiffs seeking damages and equitable relief individually and on behalf of the other Class members, each of whom purchased or leased certain General Motors (GM) vehicles with defective power liftgate struts that can unexpectedly fail, causing the liftgate to suddenly fall on people attempting to access the rear compartment.  The models and model years at issue are:  2010-2012 General Motors Corp. (GMC) Acadia, 2010-2012 Buick Enclave, 2010 Saturn Outlook, 2010-2012 Chevrolet Traverse, 2010-2012 Cadillac SRX, 2010-2012 Chevrolet Equinox, and 2010-2012 GMC Terrain (collectively, the "Class Vehicles").

2.   Each of the Class Vehicles shares a common defect: power liftgate struts that prematurely wear because the design allows dirt and debris to compromise the seals on the pressurized cylinder, allowing pressurized gas to

2

escape (the "Power Liftgate Defect").  Rather than gradually losing the ability to support the liftgate, these struts fail without warning, causing injury to anyone in the path of the liftgate and hindering the owners' ability to use their rear compartment because the liftgate will not remain open.

3.     The only permanent "fix" for the Power Liftgate Defect requires both strut replacement and a software update to the power liftgate actuator module.

4.     Consumers rely on automakers, such as GM, to promptly inform them and initiate a sufficient remedy or countermeasure when they discover a vehicle contains a defect, especially one that is present in multiple models and model years and puts personal safety at risk.

5.     On June 8, 2009, Old GM filed for protection under Chapter 11 of the United States Bankruptcy Code.  Defendant GM acquired its assets and, for model years 2010-2012, continued manufacturing and selling Chevrolet and GMC vehicles that suffer from the Power Liftgate Defect.[1]

6.     GM has been aware of the Power Liftgate Defect since at least 2010, when it issued the first of several Technical Service Bulletins (TSBs) to dealers regarding power liftgates and/or liftgate struts. GM likely had notice and knowledge of the defects prior to that, because three other automakers had issued

---

[1] Plaintiffs do not assert any claims against Old GM, nor did Old GM manufacture any of the Class Vehicles.

recalls for similar power liftgate struts from the same supplier, Stabilus, Inc., beginning in 2006.

7.    GM did not issue its own recall until 2015, and its campaign limited the remedy to a "reflash" (reprogramming) of the power liftgate actuator motor electronic control unit with a new software calibration that was intended to prevent the rapid drop of the liftgate caused by the Power Liftgate Defect.

8.    Although GM's recall campaign limited the remedy to a new software calibration, GM admitted in its recall notice to the National Highway Traffic Safety Administration ("NHTSA") that the struts in the recalled vehicles were defective because they allow dust and dirt to collect on the strut rod seals, causing the seals to fail.

9.    Despite acknowledging that the struts themselves are defective and fail prematurely, GM agreed to replace the struts only if they failed at the time of the repair or within 90 days of the repair.

10.    Further, GM limited its 2015 recall to four models, despite knowing that other models contained the same or similar struts and were the subject of consumer complaints and TSBs.

11.    Unsurprisingly, the new software calibration has failed to prevent the rapid drop of the liftgates when the struts prematurely fail.

12.     GM's recall thus provided an inadequate remedy for an insufficient group of vehicle models that contain a known safety defect.

13.     Due to the Power Liftgate Defect, Plaintiffs and the other Class members have purchased or leased vehicles that are inherently dangerous and of a lesser standard, grade, and quality than represented. Plaintiff and the other Class members did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation.

14.     As a result of GM's unfair, deceptive, and/or fraudulent conduct, Plaintiffs and the other Class members were damaged in that they paid more for their Class Vehicles than they would have paid had they known about the Power Liftgate Defect that GM failed to disclose, or they would not have purchased or leased their Class Vehicles at all.

## II.     JURISDICTION AND VENUE

15.     This Court has diversity jurisdiction over this action under 28 U.S.C. §§ 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000 and Plaintiffs and one or more of the other Class members are citizens of a different state than Defendant.

16.     This Court has personal jurisdiction over GM because GM has its principal place of business in the State of Michigan, and in this district.

17.    Venue is proper in this district under 28 U.S.C. § 1391 because GM resides in this district.   Additionally, GM has marketed, advertised, sold, and leased Class Vehicles within this district, and Plaintiff Miller reside in this district.

### III.   PARTIES

**A.    Plaintiffs**

    **1.    Michigan**

18.    Amy Miller is a citizen of Saginaw, Michigan.

19.    Ms. Miller owns a 2010 Chevrolet Traverse with the Power Liftgate Defect.  Ms. Miller purchased her Traverse used in 2014 from Al Serra Chevrolet in Grand Blanc, Michigan.

20.    GM failed to disclose the Power Liftgate Defect to Ms. Miller before she purchased her Traverse, despite GM's knowledge of the defect, and Ms. Miller, therefore, purchased her Traverse with the incorrect understanding that it would be a safe and reliable vehicle.

    **2.    Illinois**

21.    Garris Graham is a citizen of Urbana, Illinois.

22.    Ms. Graham owns a 2011 Chevrolet Equinox with the Power Liftgate Defect.   Ms. Graham purchased her Equinox new from Shields AutoMart of Paxton in Paxton, Illinois.

23.     GM failed to disclose the Power Liftgate Defect to Ms. Graham before she purchased her Equinox, despite GM's knowledge of the defect, and Ms. Graham, therefore, purchased her Equinox with the incorrect understanding that it would be a safe and reliable vehicle

### 3.     Massachusetts

24.     Bette Leonard is a citizen of Wareham, Massachusetts.

25.     Ms. Bette Leonard owns a 2012 Chevrolet Traverse with the Power Liftgate Defect.  Ms. Leonard purchased her Traverse in 2012 from Aldem Buick in Fairhaven, Massachusetts.

26.     Within the period of GM's express warranty, her powered liftgate struggled to open and required manual assistance.

27.     GM failed to disclose the Power Liftgate Defect to Ms. Leonard before she purchased her Traverse, despite GM's knowledge of the defect, and Ms. Leonard, therefore, purchased her Traverse with the incorrect understanding that it would be a safe and reliable vehicle.

### 4.     Oregon

28.     David Luse is a citizen of Camas, Washington.

29.     Mr. Luse owns a 2011 GMC Terrain with the Power Liftgate Defect. Mr. Luse purchased his Terrain used in 2013 from St. Helens Auto Center in St. Helens, Oregon.

30.     On numerous occasions within the period of GM's express warranty, the powered liftgate collapsed unexpectedly, once striking Mr. Luse on the shoulder.

31.     GM failed to disclose the Power Liftgate Defect to Mr. Luse before he purchased his Terrain, despite GM's knowledge of the defect, and Mr. Luse, therefore, purchased his Terrain with the incorrect understanding that it would be a safe and reliable vehicle.

**5.     Washington**

32.     Mike Arnadi is a citizen of Kent, Washington.

33.     Mr. Arnadi owns a 2012 Chevrolet Equinox with the Power Liftgate Defect.  Mr. Arnadi purchased his Equinox used with 11,000 miles in 2012 from Lyndwood Honda in Lynwood, Washington.

34.     The power liftgate on Mr. Arnadi's Equinox suddenly collapsed from the full-open position on multiple occasions.  On one such occasion, the collapsed liftgate smashed Mr. Arnadi into the vehicle's rear bumper.  Mr. Arnadi was forced to use his back to raise the liftgate and free himself.

35.     GM failed to disclose the Power Liftgate Defect to Mr. Arnadi before he purchased his Equinox, despite GM's knowledge of the defect, and Mr. Arnadi, therefore, purchased his Equinix with the incorrect understanding that it would be a reliable vehicle.

8

**B.     Defendant**

36.     General Motors LLC ("GM") is a Delaware limited liability company, with its principal place of business located at 300 Renaissance Center, Detroit, Michigan, and is a citizen of Michigan and Delaware.  The sole member and owner of General Motors LLC is General Motors Holding LLC.   General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan.  The sole member and owner of General Motors Holdings LLC is General Motors Company, which is a Delaware Corporation, with its principal place of business in the State of Michigan.

## IV.     FACTUAL ALLEGATIONS

**A.     GM's Notice and Knowledge of the Power Liftgate Defect**

37.     The Power Liftgate Defect affects all Class Vehicles.  The 2007 to 2012 General Motors Corp. (GMC) Acadia, 2008 to 2012 Buick Enclave, 2007 to 2010 Saturn Outlook, and 2009 to 2012 Chevrolet Traverse are "model twins" manufactured using the same platform.  The first year of each model range is the year in which the vehicle was introduced.  Similarly, the 2010 to 2012 Cadillac SRX, Chevrolet Equinox, and GMC Terrain are related models that share components.

38.     Each of the Class Vehicles contains a rear power liftgate that uses defective Stabilus struts. The liftgate is the large rear door hinged at the roofline.

Power liftgates operate via a button that, when depressed, activates the automatic opening/closing feature.  Power liftgate buttons are typically located on or near the liftgate, the interior center console or on the driver's door, and on the key fob.  The liftgate system is supported by two gas-pressurized struts, one on each side, that are intended to lift and hold the liftgate up in the fully open position as seen in the photo below.



39.     Inside each strut is a piston rod that slides in and out of the cylinder, which is sealed at the top to retain pressurized nitrogen gas inside.  The stored gas provides the pressure to hold the heavy rear liftgate in the open position. In order to hold the liftgate, the cylinder seal has to prevent the gas from escaping.

40.     As a result of the Power Liftgate Defect, the strut seals in the Class Vehicles prematurely wear, allowing gas to escape and the liftgates to

unexpectedly collapse. If it strikes a person, a falling liftgate can cause serious injury.

41. GM's power liftgate has "obstacle detection features" that on detecting an obstacle during the closing operation will automatically reverse direction to the fully open position and emit a warning chime. The vehicles also have "pinch sensors" that will open the liftgate fully if the sensor detects an object is caught between the liftgate and the vehicle.

42. Acknowledging the dangers of the power liftgate closing when a person is standing under it, the GM Owner's Manuals for the Class Vehicles warn: "You or others could be injured if caught in the path of the power liftgate. Make sure there is no one in the way of the liftgate as it is opening and closing."[2]

43. The GM Owner's Manuals for the Class Vehicles also note: "If you power open the liftgate and the liftgate support struts have lost pressure, the lights will flash and a chime will sound. The liftgate will stay open temporarily, then slowly close. See your dealer/retailer for service before using the liftgate."[3] Unfortunately, the Power Liftgate Defect allows the liftgate to drop suddenly, with no lights, chimes, or any other user warnings.

---

[2] *See, e.g.*, GMC Acadia 2011 Owner's Manual at 2-11.

[3] *Id.* at 2-12.

44.    In July 2010, GM issued a TSB notifying dealers, but not owners, of multiple problems that could occur with the power liftgates in the subsequently recalled vehicles, including that "[p]ower liftgate closes immediately after fully opening.  Usually has a loud clunking noise at top of gate travel just before power closing.  A customer and/or technician may comment that when using the power liftgate, it will open fully, drop a few inches, then power close."  The cause— which GM identified—was weak struts, which puts the power liftgate into "consumer safe mode and power close the gate slowly."  If the liftgate would not remain open, the dealer was instructed to replace the struts.[4]

45.    In June 2013, GM issued another TSB, again to its dealers only, related to liftgate struts, acknowledging that dirt and debris were wearing the strut seals, stating: "GM engineering has determined that improved durability of the liftgate strut can be realized by installing the strut assembly with the rod end facing downward (attached to the liftgate) when the liftgate is in the closed position.  In this orientation, dust and dirt does not collect on the strut housing to rod seal, which can cause wear on the seal."  Through this TSB, GM instructed dealers that when a customer brought in a vehicle for strut replacement, they were to install the

---

[4] Bulletin No. 08-08-66-005B – Power Liftgate Diagnosis and Repair Information, July 21, 2010, at 7.

new struts with the rod facing downward.[5]   Despite knowledge that the strut orientation used in hundreds of thousands of its vehicles could lead to premature wear, GM neither recalled the struts, nor instructed dealers to replace and reorient the struts.

46.     In February 2014, GM issued another TSB, extending the model years of the vehicles covered in the first TSBs through model year 2014.  In this TSB, GM stated that "[s]ome customers may state there is a clunk or pop type noise coming from the power liftgate assembly when the lift-gate reaches the full open position.  They may also notice that the lift-gate drops slightly when this occurs." Although GM informed its dealers the "clunk" noise was normal when a power liftgate clutch disengages, it also told dealers to check to ensure the struts were not weak and could hold the liftgate open.[6]

47.     In a March 2014 TSB, GM noted that customers with the 2010-2014 Cadillac SRX, Chevrolet Equinox, and GMC Terrain also had complaints about the power liftgates.   Specifically, GM represented that "[s]ome customers may comment that power lift gate sags (lowers) from the (selected) open position.  This is a limited amount of movement and the gate does not lower unintentionally.  The

---

[5] PI0984A – Revised Liftgate Strut Replacement Procedure, Jun 10, 2013, at 1.

[6] PIT5246A – Clunk or Pop Type Noise from Power Lift-Gate Assembly at Full Open Position, Feb 20, 2014.

customer may also comment the liftgate reverses travel when opening or closing." Again, GM instructed dealers to "check the right side gas strut for signs of wear, cracks, leaks or other damage, then check the hold open ability of the gas strut and replace the liftgate strut as needed."[7]

48.     In June 2015, GM recalled the 2007 to 2012 General Motors Corp. (GMC) Acadia, 2008 to 2012 Buick Enclave, 2007 to 2010 Saturn Outlook, and 2009 to 2012 Chevrolet Traverse.   GM specified that the "vehicles have a condition in which the gas struts that hold the liftgate up may prematurely wear" because the struts "are oriented in a way that allows dirt particles to penetrate between the piston rod and the guiding bushing package."[8]

49.     In conjunction with that recall, GM further admitted the Power Liftgate Defect, representing that the "vehicles have a Prop Rod Recovery system intended to accomplish a controlled, slow return of the liftgate to the closed position if the liftgate's gas struts are no longer capable of supporting the weight of the liftgate.   However, in these vehicles, the liftgate's Prop Rod Recovery system software may be unable to detect/stop a liftgate with prematurely worn gas struts from falling too quickly after the liftgate is opened."[9]

---

[7] PI1186 – Diagnosing and Repairing Power Liftgate Operation, March 3, 2014.

[8] GM, Recall No. 15V415 Safety Recall Report, June 24, 2015.

[9] *Id.*

50.     The Prop Rod Recovery system, therefore, was never intended to hold the liftgate in the full open position, as this is the job of the struts.

51.     Rather than replace the struts that GM admitted could prematurely wear and fail, the repair was limited to "reflash[ing] the power liftgate actuator motor ECU (Electronic Control Unit) with a new software calibration intended to mitigate the condition."[10]  Dealers were instructed to verify that the liftgate stayed up; if it did not, they were instructed to replace the struts.  If the struts failed within 90 days of the software upgrade, dealers were instructed to replace them for free "in the interest of customer satisfaction."[11]  If they failed after 90 days, it was considered to be a normal maintenance repair for which GM required customers to pay.

52.     In the dealer repair procedures, GM also instructed that if the struts needed to be replaced, they should be installed upside down (with the rod end facing downward), again indicating the struts were oriented in such a way as to allow debris and dirt to damage the seal.

53.     GM later extended the suspect manufacturing date by eight days, from vehicles manufactured through March 1, 2012, to vehicles manufactured through

---

[10] *Id.*

[11] GM, Recall No. 15V415 Product Safety Recall Instructions to Dealers, Nov. 2015.

March 9, 2012, without providing an explanation.[12]  As demonstrated below, this date appears to be arbitrary, as several consumers complained they experienced the problem in model year 2012 vehicles that were outside the recall range.

54.    In its Part 573 Defect Notice for the recall, GM claimed that it first received a complaint of a liftgate failure from a company vehicle driver in 2010, but it did not take action because of "the low rate of incidents in the field."  It concluded a recall was needed only after it received two other complaints.

55.    A Reuters article quoted a GM email in response to the article as saying that the company had, at that time, received 56 injury reports.[13]

56.    GM did not recall the 2010 to 2014 Cadillac SRX, Chevrolet Equinox, and GMC Terrain vehicles, despite its TSB noting that these too had struts that were prone to premature wear.

57.    GM was thus aware that the struts that were not replaced (because they had not yet failed) had a defect that allowed the seal to fail, and were oriented in a direction that its engineers had determined exacerbated the defect.  Yet, GM failed to authorize a general strut replacement program, thus keeping Plaintiffs and the other Class members at risk and without the benefit of their bargain.

---

[12] GM, Recall No. 15V415, Dealer Instructions 15240C – Power Lift Gate Prop Rod Recovery, Nov. 2016.

[13] "GM Recalls 780,000 SUVs for Possible Lift Gate Issue," Reuters, July 10, 2015.

B.   **Other Automakers' Recalls for Similar Stabilus Struts**

58.   GM should have been aware that Stabilus struts have a long history of defects.  Indeed, Ford, Toyota, and Honda have each issued recalls of Stabilus power liftgate struts for premature wear that caused the liftgate to suddenly fall. Two of these recalls were the result NHTSA investigations that were initiated following reported injury complaints.

59.   Ford was the first OEM to recall Stabilus struts used in its power liftgates.  In its 2006 Part 573 defect notice to NHTSA, Ford noted that it was recalling model year 2005-2006 Ford Freestar and Mercury Monterey vehicles after receiving 32 complaints of the liftgates suddenly falling, three of which resulted in injuries that required medical attention.  Ford framed its defect as: "[a]fter being powered open, the power liftgate motor automatically disengages. In the event of a liftgate strut malfunction, the liftgate can fall freely with no prior warning."[14]

60.   Also in 2006, NHTSA opened a Preliminary Evaluation into Toyota power liftgates after receiving eight complaints of failure that resulted in four injuries.[15]  Toyota confirmed it had received an additional 86 complaints, including

---

[14] Ford, Recall No. 06V069, Part 573 Defect Notice, Mar. 6, 2006.

[15] NHTSA, PE06-029, Opening Resume, Aug. 2, 2006.

11 injuries.[16]  NHTSA later learned there had been a total of 410 complaints, with 98 injuries, and an additional 12,452 warranty claims.[17]  After determining that claims related to the 2004-2006 Sienna were significantly higher than other vehicles, NHTSA upgraded the investigation to an Engineering Analysis (EA06-020).

61.    Toyota described the failure to NHTSA as follows: "Over time, seal damage may occur where the strut rod enters the strut body, resulting in leakage of the high pressure gas.  The seal may be damaged by scratches on the strut rod, which may occur as a result of elastic deformation of the strut rod during operation (the strut rod may deform and contact the strut guide in the strut body), or some type of contamination (dirt, dust, etc.) which may enter the seal."[18]

62.    Toyota claimed this was not a safety defect because the vehicles had two mechanisms that protected people from injury: (a) a jam protection feature that reverses the closing of the liftgate when there is an obstruction; and (b) a power close feature that prevents freefall of the liftgate.[19]  Toyota also asserted that the vehicles emitted an audible warning when they were about to close suddenly.

---

[16] Toyota, PE06-029, Response to NHTSA's inquiry, Oct. 19, 2006.

[17] NHTSA, EA06-020, ODI Closing Resume, June 25, 2008.

[18] NHTSA, EA06-020, Engineering Analysis Report, June 2008, at 4.

[19] *Id.* at 15.

63.     NHTSA concluded that none of these features had prevented injuries, stating:  "The real-world experience has shown that the liftgate struts in the subject vehicles do not appear to be performing to Toyota's expected life.  The fact that the liftgate struts on the subject vehicles are failing at very high rates indicates a design defect in the liftgate struts.  Toyota's several design changes and the results of these design changes on the performance of the liftgate struts buttress this conclusion—if the struts were not wearing out prematurely, a design change should not be necessary in order for the struts to meet Toyota's expected design life."[20]

64.     Dismissing Toyota's protests that a recall was unnecessary because it had implemented an extended warranty program to address the concerns, NHTSA stated, "A safety recall will ensure that vehicle owners have notice of those safety risks and an opportunity to obtain a remedy before the struts fail, preventing a significant risk of injury."[21]  Thus, Toyota recalled about 196,000 model year 2004-2006 Sienna vans to replace their struts with the improved design (recall 08V244).

65.     During the investigation into the Toyota Sienna, NHTSA discovered there had also been at least 36 complaints and 1,413 warranty claims regarding the

---

[20] *Id.*

[21] *Id.* at 2.

power liftgates on the 2005 Honda Odyssey Touring minivan, which also used Stabilus struts.[22]  The agency opened a Preliminary Evaluation into the Odyssey Touring in April 2008 (PE08-026), which became an Engineering Analysis (EA08-015) in August 2008 after NHTSA learned there had been 51 complaints and 10 injuries.[23]  As with the Toyota, NHTSA eventually concluded that the struts were defective.  NHTSA stated: "ODI [Office of Defect Investigations] believes that the failure of the original equipment liftgate struts on the subject vehicles is the result of defects in design and manufacturing, and these struts will continue to fail in a similar and significant fashion as has been demonstrated by the facts gathered during the investigation.  These struts exhibit a high early-life failure rate and an increasing failure trend.  Failing struts pose a risk of injury to persons standing under the liftgate or accessing the rear cargo area in these vehicles."[24]

66.    In its Engineering Report for EA08-015, NHTSA noted that Honda had determined the struts contained scratches on the strut rod that damaged the seal, allowing gas to escape.[25]  Honda had required that Stabilus remove burrs and a sharp edge from the strut's plastic guide element, which had made the struts more

---

[22] NHTSA, EA08-015, Engineering Analysis Report, Apr. 2010, at 1.

[23] *Id.*

[24] *Id.* at 2.

[25] *Id.*

20

robust in mid-2005.[26]  Like Toyota, Honda refused to classify the defect as safety related, saying instead that it posed an inconvenience to users.[27]  NHTSA closed the investigation in 2010 when Honda agreed to recall about 22,000 model year 2005 Odyssey Touring vehicles to replace the struts.[28]

67.    Despite the design changes to the Stabilus struts, they continued to fail.  In 2011, NHTSA opened another investigation (PE11-034) after receiving seven complaints of sudden closures for power liftgates on the 2009 Honda Odyssey.[29]  Much of the design-specific information has been redacted in Honda's responses to NHTSA, but the unredacted portions state that in 2007, it had attempted to correct the defects in Stabilus struts in its 2007 Odyssey because the failure rate was excessive.[30]  Honda determined at that time that the struts had several issues: (a) the metal seal protector contained burrs, causing damage to the seal; (b) strut piston concentricity was not maintained because there was an imbalance of force leveraged through the rod to the piston at the rod guide; (c) the rods were damaged during the riveting process; and (d) the rod inspection process

---

[26] *Id.*

[27] Honda, Recall No. 10V055, Part 573 Defect Notice, Feb. 18, 2010.

[28] *Id.*

[29] NHTSA, PE11-034, ODI Opening Resume, Sept. 23, 2011.

[30] Honda, PE11-032, Response to NHTSA, Nov. 22, 2011, at 6-7.

was insufficient.[31]   Honda and Stabilus developed countermeasures for each problem.

68.   Honda required a liftgate design change for the 2008-2010 Odyssey. However, in 2009, Honda again had a high rate of complaints and determined the rod was being damaged by contact with the rod guide and had Stabilus apply a second spacer in the strut to prevent scratches.[32]   Honda noted that the motor was programmed to detect a falling liftgate and re-open the liftgate if it dropped four inches.[33]

69.   Honda asserted: "Similar to our assessment of the risks associated with this condition in response to an earlier NHTSA inquiry into comparable allegations on 2005 model year Odyssey vehicles, we do not believe that this possesses an unreasonable risk to motor vehicle safety.  In the event that one or both of the liftgate struts fails the power liftgate system is designed to alert the user visibly, audibly and by operating in an unfamiliar manner at predictable and controlled speeds…the system is designed to detect that the liftgate has not

---

[31] Honda, PE11-032, Response to NHTSA, Nov. 22, 2011, at 7.

[32] *Id.*

[33] *Id.* at 11.

remained open, and is programmed to re-open the liftgate by the power of the electric motor."[34]

70.    NHTSA did not agree that this was a sufficient mitigation.  Noting that there had been 107 complaints, including 13 injuries, related to the defect, NHTSA stated: "Unlike vehicles with non-powered (manual) liftgates, the subject vehicle's liftgate can be opened automatically (via the power liftgate motor) even when the struts are in a degraded condition and can no longer support it in the open position.  Consumers standing or accessing the rear cargo area under the liftgate and expecting the liftgate will stay open, can be struck when the liftgate unexpectedly drops, or can be trapped under the liftgate as it power closes, both of which can occur when the system detects and reacts to degraded struts.  By contrast, users of a manual liftgate assist in lifting it, and thus notice the lack of support as the strut degrades."[35]

71.    NHTSA asked that Honda recall about 45,750 model year 2008-2009 Odyssey vans equipped with struts made before January 2009, when Honda added the spacer to prevent rod scratches.[36]  This time, Honda did not assert it was merely

---

[34] *Id.* at 14.

[35] NHTSA, PE11-034, ODI Closing Resume, Feb. 29, 2012.

[36] Honda, Recall No. 12V062, Part 573 Defect Notice, Feb. 16, 2012.

an inconvenience, instead noting a potential risk of injury. The remedy included replacing both struts.

72. Thus, after investigations prompted by fewer complaints of injuries than GM acknowledged to Reuters it had received by 2015, NHTSA required recalls of Stabilus struts that could prematurely wear from debris. NHTSA explicitly determined that prematurely worn struts present a safety hazard and dismissed the automakers' assertions that mitigating software was enough to prevent injury.

## C.   Stabilus and the Power Liftgate Defect

73. On its website, Stabilus proclaims itself "the world market leader for gas pressure springs," stating that it has "an excellent reputation as a development supplier to the automotive industry for decades."

74. On websites selling Stabilus liftgate struts for various vehicles, Stabilus states: "Through long-term experience and close collaboration with nearly every major original equipment manufacturer in the world STABILUS understands the critical quality that's needed to provide original equipment parts for Ford Hyundai GM BMW Mercedes-Benz Porsche Audi Honda Toyota etc. Today STABILUS supplies the original equipment manufacturers with the overwhelming majority of gas springs for new vehicles and incorporates the same quality into each aftermarket spring."

24

75.     In Stabilus's responses to NHTSA, discussed below, it noted that the 2008 to 2012 Buick Enclave, Saturn View, and GM Acadia vehicles, and the 2009 to 2012 Chevrolet Traverse vehicles were supplied with Stabilus struts.

76.     Additionally, Stabilus sells replacement and Original Equipment (OE) struts for the Cadillac SRX, Equinox, and Terrain vehicles.

77.     Following Honda's 2012 recall, NHTSA opened an Equipment Query investigation into Stabilus to determine which other companies had purchased the defective struts.[37]  In its response, Stabilus stated that it supplied struts for "nearly all vehicles produced in North America," but that no other manufacturer received the "same" struts as those that were recalled.[38]  The recalled Honda Odyssey, Toyota Sienna, and Ford Freestar had struts that were similar in that they had a combination of a small diameter rod in a large diameter tube, which Stabilus stated no other OEM received.[39]

78.     Stabilus noted, however, that the 2008 to 2012 Buick Enclave, Saturn Vue, and GMC Acadia vehicles, and the 2009 to 2012 Chevrolet Traverse vehicles had struts similar to the Freestar and Sienna struts.  Stabilus claimed the defects that led to the previous recalls had been corrected in 2006, before the GM vehicles

---

[37] NHTSA, EQ12-010, ODI Opening Resume, Sept. 28, 2012.

[38] Stabilus, EQ12-010, Response to NHTSA, Oct. 19, 2012.

[39] Stabilus, EQ12-010, Response to NHTSA, Oct. 19, 2012, at 2.

began receiving the struts.[40] That assertion was, of course, false, as Honda had recalled Stabilus struts manufactured through 2009 after continuing issues with the struts.

79.   Stabilus argued it had not been proven there was a defect in the struts; rather, Stabilus contended that there was an issue with the overall system design, particularly the software.[41]

80.   Countering NHTSA's previous conclusions that the struts were failing prematurely, Stabilus emphasized that it is well-recognized that "all struts will eventually fail and gradually lose pressure" and that OEMs do not require robustness or safety functions other than that it function properly when installed.[42] Despite complaints of the liftgate suddenly shutting on customers, Stabilus contended it was unaware of "any confirmed reports of sudden and complete gas loss while the liftgate is open," instead blaming the vehicle for disengaging the clutch, allowing the rapid movement of the liftgate.[43]

---

[40] *Id.* at 3.

[41] *Id.* at 6, 8.

[42] *Id.* at 6.

[43] *Id.* at 7.

81.    NHTSA closed the investigation, in large part based on Stabilus's claim that most of the struts that were similar to the recalled struts were aftermarket parts not manufactured by Stabilus.[44]

82.    Given this extensive defect history, GM knew or should have known that Stabilus struts had previously exhibited numerous manufacturing issues that, at least in Honda's case, were corrected only to have other issues appear, a significant indicator that Stabilus lacked sufficient quality control measures.

83.    GM was also aware that NHTSA viewed reports of injuries (as few as seven) as worthy of an investigation and that the agency found sudden power liftgate failures were a serious safety threat that could not be corrected simply by software that mitigated the closings after the liftgates had fallen several inches.

84.    Finally, GM was or should have been aware that hundreds of complaints were reported to NHTSA's Vehicle Owner Questionnaire database and to its dealers related to sudden failures in power liftgates.  Many owners have alleged that liftgates fell all the way down, or in other instances, fell halfway before either slowly closing or reversing direction, indicating that even if the software activates the mitigation feature, the liftgate is able to fall many inches.  In

---

[44] NHTSA, EQ12-010, ODI Closing Resume, Dec. 31, 2012.

either type of situation, people who were standing in the path of the liftgate were injured.

## D.    Consumer Complaints

85.    By the end of 2012, as NHTSA was concluding its investigation of Stabilus struts, the agency had received at least 28 reported complaints of sudden falls of power liftgates in GM vehicles, including nine complaints related to vehicles that GM later recalled.

86.    Currently, there are more than 200 consumer complaints, more than half of which concern the Class Vehicles.

87.    The complaints demonstrate that: (1) the struts used in the Class Vehicles are prone to premature wear and that the Power Liftgate Defect is a significant safety risk, (2) that the recall was too narrow in scope, and (3) that the software "fix" GM provided under its recall was ineffective.

88.    Countering GM's contention that this is not a safety issue, many of the complaints to NHTSA include injury allegations.  For instance:

- TL* the contact owns a 2009 Saturn Outlook. The power lift-gate fell on his head. He had to receive treatment from the hospital for injuries. He has not called the dealer or manufacturer. The failure mileage was 7,000. Updated 01/29/10 *bf the dealer replaced the faulty shock. Updated 01/29/10 (ODI 10295558) [2009 Outlook]

- TL* the contact owns a 2012 Chevrolet Traverse. The contact stated that she opened the power lift-gate to retrieve luggage from the rear and as the gate opened she

28

saw some of the luggage about to fall and reached inside the vehicle. At that point, the lift-gate stopped opening and began to close. The power lift-gate then closed on the contact, breaking her hand. The dealer and manufacturer had not been contacted at the time of the complaint. The vehicle had not been repaired. The failure and current mileages were 7,000. Updated 08/28/12*LJ the consumer stated further x-rays revealed, a broken wrist, bruised bones and nerve damage. Updated 08/29/12 (ODI 10467219) [2012 Traverse]

- 2009 Buick Enclave. Consumer writes in regards to power liftgate malfunction. *smd the consumer stated the power liftgate malfunctioned and injured her husband in April 2013. The consumer stated her husband planned to remove some items from the vehicle. As she pushed the power button, the liftgate began to open as usual. When it reached the top, her husband started to reach for the items. Without warning, the very heavy liftgate dropped about 18-24 inches, hitting him on the forehead and cutting a perfect v which matched the design of the latch. He was knocked to the ground with blood pouring from the gash in his head. The next day, the vehicle was taken to the dealer, where the struts were replaced. (ODI 10513176) [2009 Buick Enclave]

- TL* the contact owns a 2012 Chevrolet Traverse. The contact stated that she opened the power lift-gate to retrieve luggage from the rear and as the gate opened she saw some of the luggage about to fall and reached inside the vehicle. At that point, the lift-gate stopped opening and began to close. The power lift-gate then closed on the contact, breaking her hand. The dealer and manufacturer had not been contacted at the time of the complaint. The vehicle had not been repaired. The failure and current mileages were 7,000. Updated 08/28/12*lj The consumer stated further x-rays revealed, a broken wrist, bruised bones and nerve damage. Updated 08/29/12 (ODI 10467219) [2012 Chevrolet Traverse]

- A female used the automatic liftgate option to open the back gate and get items out of the back. After the gate opened fully, it fell forcefully for about 2 feet, directly onto her head. This resulted in her falling to the ground on concrete, blacking out, and becoming very dizzy and nauseas. She is currently being transported by ambulance to the hospital. This is a definite safety issue and malfunction that may cause serious injury or death. *TR (ODI 10572571) [2009 Acadia]

- I pressed the power lift gate button it opened & I was placing a bag in back of car when the lift gate went down without warning & hit me in the head. Causing a head injury that required medical attention 2 head lacerations that required 7 staples (ODI 10748097) [2012 Acadia]

- On the afternoon of August 12, 2015 I was walking towards the rear open door that my nephew had opened. I did not see the door coming down, no beeping....it hit the top of my head and kept going down pushing me to the ground. I had a concussion and the ambulance took me to the hospital being as I had been unconscious. Spent one day in the hospital with lots of tests to see if my spine was damaged. No damage there after lying in their bed with a neck brace on. Will have follow up with neourologist [sic][45] with more tests. You need to have some kind of warning sound to let people know when the door is coming down. No resistance to the door when my brother in law tested it also. Please check into this.... (ODI 10748946) [2011 Equinox]

- Rear hatch does not stop after opening. It goes up and down several times then shuts. Slammed down and hit my wife on her shoulder. We cannot use the rear hatch due to safety concerns. Never been in an accident other than a small scrape on the side door. This needs to be

---

[45] All of the complaints to NHTSA are quoted verbatim from the NHTSA website.

addressed as soon as possible. Safety issue (ODI 10882171) [2012 Cadillac SRX]

- Vehicle was parked. Pressed button to have rear power lift gate open. As it was fully opening, I put one of my grocery bags in the rear hatch the lift gate powered down onto my head without warning. It knocked me to the parking lot. Without any direction from me it went partially up and down again and then closed fully. I got up and tried the button again to open the lift gate. It opened and then jerked down and then up and then closed. It still malfunctions this way and won't open and stay opened. (ODI 11014882) [2012 Cadillac SRX]

- The hatch back door that lefts up by a touch of a button came crashing down on my head while putting in the groceries. The next time it came down on my fingers. Also came down on my daughters back. All the time without warning. It lefts up just fine but it comes crashing down at any time. I took it to GMC dealership and they reported that the oil was liking from the left side terrain lift gate tailgate hatch-actuator 23432304. Part number 23432304 for 2013 GMC Terrain. This could seriously hurt someone. I have turn mine to off and have to lift it manually. No fun. It's heavy. (ODI 10928900) [2013 GMC Terrain]

89. Even when the Electronic Control Unit activates and reverses direction or slows the liftgate closure without causing injury, as is often the case with the SRX, Equinox, and Terrain models, it still falls low and quickly enough that owners are unable to get out of the way. For example:

- After my liftgate opened, it shuddered and came crashing 3/4's of the way down. Had I been in the way, I would have been hit and undoubtedly injured. Very dangerous situation which has caused me to be unable to use my vehicle for which it is intended - I cannot access the

31

cargo area for loading and unloading heavy and large items! I purchased this vehicle explicitly for it's large cargo area and easy accessibility. I now have a very difficult time loading and unloading heavy and bulky items from the backseat of my car. (ODI 10762586) [2012 Acadia]

- After being opened, rear power liftgate suddenly falls, drops 3/4 of the way down, comes back up to full height, drops again all the way down, and then the door closes. Vehicle was stationary and parked in the driveway as I was getting my dog out of the back of the vehicle. (ODI 10906883) [2011 GMC Terrain]

- After opening, the lift gate closes slowly on its own all of the time. Happens whenever the lift gate is open in a stationary position. Has been ongoing for a couple of months now. Has closed several times on myself and my husband. (ODI 10926695) [2012 Cadillac SRX]

- I was loading items in the back with the lift gate open when it suddenly began to close and hit me but continued to close, retracting only after about 5 seconds and a physical battle between me and the gate. I received a bruise on my arm from the battle and saw my life flash before my eyes. The car was off and stationary in my yard. It was the most frightening experience of my life! (ODI 10981517) [2012 Cadillac SRX]

- On May 27th I was opening the lift gate to unload items. The car was off. I opened the lift gate using the button under the handle. The door opened fully. I reached in the car to remove luggage. The door closed quickly on my back and stopped just before pinning me in the door way. The door immediately opened a second time and I moved quickly out of the way. As soon as it opened fully, it slammed completely shut. I am still unable to use the lift gate safely. (ODI 10994526) [2012 Equinox]

90.     Many consumers complained that when they took their recalled vehicles in for repair, GM did not have replacement parts available for months:

- 1. The power lift gate on my vehicle failed on 7/23/15. When it opened, it went all of the way up automatically and then came crashing back down and nearly hit me in the head. 2. The failure from that point on happens each and every time so I had to turn the feature off. 3. I contacted both GM directly and spoke to a local dealership twice (hare Chevrolet in Noblesville, IN) and both told me that there is a recall on this item but no solution and subsequently no parts have been manufactured to correct problem. I was told that I could fix it out of my own pocket (with the same suspected faulty parts) but there was no guarantee I would be reimbursed as a result I have not been able to use my power lift gate in four months now. I received a recall notice in August with no updates in three months. I spoke to the dealership on 10/31/15 and was told there was no update on this recall. (ODI 10788243) [2012 Acadia]

- TL* the contact owns a 2009 GMC Acadia. The contact stated that while in park, the liftgate inadvertently closed while the contact was behind the vehicle. As a result, the contact became wedged in between the liftgate and the bottom of the vehicle. The contact did not sustain any injuries. The vehicle was taken to a dealer, who diagnosed that the gas struts needed to be replaced. The vehicle was not repaired. The VIN was included in NHTSA campaign number: 15V415000 (structure); however, the part needed to repair the vehicle was unavailable. The manufacturer was not notified of the failure. The failure mileage was 85,000. (ODI 10748362) [2009 Acadia]

91.     Some owners reported their vehicles fell just outside the seemingly arbitrary recall dates of manufacture.  For instance:

- 6/18/15 liftgate came crashing down on my head so the struts were replaced at dealership for 116.72 plus tax. There is a recall #15240 for this repair. But my car was built on 3/8/2012 which is 9 days after the recall dates you submitted. This date needs to be extended. More investigation needs to be looked into this and obviously my car in within the parameters of this recall. Are they waiting for someone to get hit so hard in the head and be killed. I would hope not. [Another issue redacted] (ODI 10788706) [2012 Acadia]

92.    Other consumers complained that after participating in the recall and having the recall repair completed, they continued to experience the problem, demonstrating that the software update alone is insufficient to correct the defect:

- Liftgate was not staying up - there was a recall and I took it in - now.......I had mine fixed and when I was getting ready to trade in, low and behold it starts to open then closes right away again. They didn't change any parts, they only "reprogrammed" the motor per the paperwork. I just called the dealer repair service and they say, I am right they didn't the steps are to first "reprogram" and if that fixes it they don't have to change anything out. Now my hatch open partly then closes again, without even going all the way up and I was just told, bring it back up and we will check it and it if does not link to the recall, they will need to do more testing. Go figure. My car wasn't doing this when I took it in, and now mysteriously this happens. Not happy!!!!!! (ODI 10851734) [2007 Saturn Outlook]

- I had my recall done on the liftgate in 2015. Yesterday my wife was getting bags of car and it fell on her head. She felt it and slide quickly from under. She already have problems with her head from other things. (ODI 10861170) [2012 Acadia]

- GM had recall on power lift gate were struts were failing and falling down on people December 2015 they didn't replace struts (said they were good) and just repositioned them (band aid fix) my wife was hit with lift gate in the back (liftgate came crashing down). I took it to dealer for them to fix. I was told that since the fixed they did in Dec 2015 lasted more than 90 days they weren't liable to repair it. GM doesn't care about the health and safety of their customers. They should be made liable to fix and replace the gas struts on these power lift gates before someone becomes serious hurt.$40,000 dollar car and they just don't care. It's a 2012 Bucik Enclave. I was never told that recall fixes only lasted 90 days? (ODI 10915699) [2012 Buick Enclave]

- I had mine fixed already. 2011 Chevy Traverse LTZ now my hatch opens, then closes right away, opens again and then closes again. What is going on here. And the whole AC actuator door. Yeah. … let's not go there. This needs to be recalled as well. And repairs refunded.

- I had mine fixed couple of weeks ago. I had no problem before but now it clunks when it opens and sometimes drifts down. I cracked my head on it twice today due to it slowly falling.

**E.    GM Continuously Proclaimed That the Class Vehicles Were Dependable and of the Highest Quality, Concealing and Omitting the Power Liftgate Defect.**

93.    GM extensively advertised the benefits of their power liftgate, and the dependability of the Class Vehicles.  But at no point did GM inform buyers and/or lessees of the Class Vehicles that the Class Vehicles suffered from the Power Liftgate Defect.

94.    GM advertised in their sales material for the 2012 Traverse that "most customers would be surprised to learn about the attention to details. We test everything.  We measure how the carpet wears.  We slam doors thousands of times…It's all part of how Chevy interior designers stay open to what might make your next vehicle even better."

95.    Additionally, in the material for the 2012 Traverse, GM states:

> Our engineers understand that family members come in many shapes and sizes, which is why we designed Traverse to carry everything you care about.  That means creating **24.4 CUBIC FEET OF STORAGE** behind the third row, enough room to hold all your groceries, gear and dog treats.  **WIDE OPENING DOORS** add more convenience and an available **REMOTE POWER LIFTGATE** makes loading and unloading easy. Configure away with available **60/40 SPLIT REAR SEATS** and you'll find new possibilities for storing the stuff that matters most on any given day.

96.    GM advertised the power liftgate in their sales material for the 2012 GMC Acadia−stating:

> **REMOTE POWER LIFTGATE** Loading up your Acadia with your hands full? Let us help you with that. The available power liftgate opens with a touch of your key fob for easier access to your Acadia's impressive cargo capacity.  You can close it the same way, or use the fingertip buttons located on the liftgate or on the center console.

97.    In advertising the 2012 Chevrolet Equinox, GM stated in their brochures:

Larger packing jobs benefit from the ingenious **MULTI-FLEX® SLIDING REAR SEAT**, which is also a **60/40 SPLIT-FOLDING SEAT**, that adds greater flexibility. Folded flat, it creates 63.7 cubic feet of very uncompact cargo space. Slide the seat forward to add almost eight extra inches of storage. Slide it back to add almost eight extra inches of rear leg room for taller passengers—the most in its class. And because we try to imagine all the ways you can use Equinox, we offer an available segment-exclusive **PROGRAMMABLE POWER LIFTGATE**. So now you decide how high you want the liftgate to open. The fun pours out on its own.

98.    GM advertises the power liftgate for the 2012 GMC Terrain by stating, "With the help of an available programmable power liftgate, loading and unloading Terrain's rear cargo area is incredibly easy, even in low-clearance situations."

99.    GM goes on to state in the terrain brochure:

**PROGRAMMABLE POWER LIFTGATE** Helping you take advantage of its easy cargo access, Terrain offers an available programmable power liftgate. It opens and closes with the touch of a button to the height you select. Electronic obstacle detection can stop and reverse liftgate motion to prevent damage.

100.    The power liftgate in the Cadillac SRX is advertised in the 2012 brochure as an easy way to access storage.  GM states, "[a]dditional storage can be found in the front and rear doors, and in the backs of the front seats. Accessing all that space is easy, thanks to the available power liftgate with memory height that can be programmed for easy reach or to avoid a low garage ceiling."

37

101.   None of the Owner's Manuals or brochures for the Class Vehicles revealed the Power Liftgate Defect.

102.   GM repeatedly told consumers that the Class Vehicles were dependable, long-lasting, and of the highest quality, while failing to reveal the Power Liftgate Defect.

103.   One online ad for "GM certified" used vehicles that ran through April 5, 2010 stated that "GM certified means no worries."

104.   In April 2010, General Motors Company Chairman and CEO Ed Whitacre proclaimed in a commercial that GM was "designing, building, and selling the best cars in the world."

105.   A radio ad that ran during the time period relevant to this action stated that "[a]t GM, building quality cars is the most important thing we can do."

106.   On November 10, 2010, GM published a video that told consumers that GM actually prevents any defects from reaching consumers.   The video, entitled "Andy Danko: The White Glove Quality Check," explains that there are "quality processes in the plant that prevent any defects from getting out."   The video also promoted the ideal that, when a customer buys a GM vehicle, they "drive it down the road and they never go back to the dealer."

107.   In its 2010 Annual Report, GM told consumers that it built the world's best

vehicles:

> We truly are building a new GM, from the inside out.
> Our vision is clear: to design, build, and sell the world's
> best vehicles . . . . Our plan is to steadily invest in
> creating world-class vehicles, which will continuously
> drive our cycle of great design, high quality and higher
> profitability.[46]

108.    In a "Letter to Stockholders" contained in its 2011 Annual Report,

GM noted that its brand had grown in value and that it designed the "World's Best

Vehicles":

> Design, Build and Sell the World's Best Vehicles
>
> This pillar is intended to keep the customer at the center
> of everything we do, and success is pretty easy to define.
> It means creating vehicles that people desire, value and
> are proud to own. When we get this right, it transforms
> our reputation and the company's bottom line.[47]

109.    In its 2012 Annual Report, GM boasted that:

> What is immutable is our focus on the customer, which
> requires us to go from "good" today to "great" in
> everything we do, including product design, initial
> quality, durability, and service after the sale.[48]

110.    In its 2012 Annual Report, GM represented that product quality was a

key focus:

---

[46] GM 2010 Annual Report at 2.

[47] GM  2011 Annual Report at 2

[48] GM 2012 Annual Report at 12.

> Product quality and long-term durability are two other
> areas that demand our unrelenting attention, even though
> we are doing well on key measures.[49]

111.   GM consistently promoted all of its vehicles as reliable, and presented itself as a responsible manufacturer that stands behind GM-branded vehicles after they are sold.

112.   GM knowingly omitted and concealed information about the Power Liftgate Defect in the Class Vehicles from the driving public, including Plaintiffs and the other Class members, thereby allowing unsuspecting vehicle owners and lessees to purchase (or lease) and to continue unknowingly driving defective vehicles that were of diminished value and bound to cause costly problems.

## V.   TOLLING OF THE STATUTES OF LIMITATION

### A.   Discovery Rule Tolling

113.   Neither Plaintiffs nor the other Class members could have discovered through the exercise of reasonable diligence that their Class Vehicles were defective within the time period of any applicable statutes of limitation.

114.   Among other things, neither Plaintiffs nor the other Class members knew or could have known that the Class Vehicles are equipped with defective power liftgate struts and thus had the above-described Power Liftgate Defect.

---

[49] GM 2012 Annual Report at 10.

**B.     Fraudulent Concealment Tolling**

115.   Throughout the time period relevant to this action, GM concealed from and failed to disclose to Plaintiffs and the other Class members vital information concerning the Power Liftgate Defect described herein.

116.   Indeed, GM kept Plaintiffs and the other Class members ignorant of vital information essential to the pursuit of their claims.   As a result, neither Plaintiffs nor the other Class members could have discovered the defect, even upon reasonable exercise of diligence.

117.   Specifically, throughout the Class Period, GM has been aware that the liftgate manufactured and installed in the Class Vehicles was defective.

118.   Despite its knowledge of the defect, GM failed to disclose and concealed, and continues to conceal, this critical information from Plaintiffs and the other Class members, even though, at any point in time, it could have done so through individual correspondence, media release, or by other means.

119.   Plaintiffs and the other Class members justifiably relied on GM to disclose the Power Liftgate Defect in the Class Vehicles that they purchased or leased, because that defect was hidden and not discoverable through reasonable efforts by Plaintiffs and the other Class members.

120.   Thus, the running of all applicable statutes of limitation have been suspended with respect to any claims that Plaintiffs and the other Class members

have sustained as a result of the defect, by virtue of the fraudulent concealment doctrine.

## C.    Estoppel

121.   GM was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the defective liftgate and the Power Liftgate Defect.

122.   GM knowingly concealed the true nature, quality, and character of the defective power liftgate struts.

123.   Based on the foregoing, GM is estopped from relying on any statutes of limitations in defense of this action.

## VI.    CLASS ACTION ALLEGATIONS

124.   Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated.

125.   Plaintiffs seek to represent a class ("the Nationwide Class") defined as:

> All current and former owner or lessees of a Class Vehicle (as defined herein) that was purchased in the United States.

126.   Plaintiffs also respectively seek to represent the following statewide classes ("the Statewide Classes") defined as follows:

- All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Michigan ("the Michigan Class").

- All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Illinois ("the Illinois Class").

- All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Oregon ("the Oregon Class").

- All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Massachusetts ("the Massachusetts Class").

- All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Washington ("the Washington Class").

127.   Excluded from each of the Nationwide and Statewide Classes are Defendant General Motors LLC and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; and the Court staff assigned to this case and their immediate family members.  Plaintiffs reserve the right to modify or amend these Nationwide and Statewide Class definitions, as appropriate, during the course of this litigation.

128.   The Classes expressly disclaim any recovery in this action for personal injury resulting from the Power Liftgate Defect, without waiving or dismissing any such claims.

129.  This action has been brought and may properly be maintained on behalf of the Nationwide and Statewide Classes proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

130.  **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**  The members of the Nationwide and Statewide Classes are so numerous and geographically dispersed that individual joinder of all class members is impracticable.  While Plaintiffs are informed and believe that there are not less than 1.5 million members of the Nationwide and Statewide Classes, the precise number of Nationwide and Statewide Class is unknown to Plaintiffs, but may be ascertained from GM's books and records.  Nationwide and Statewide Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

131.  **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).**  This action involves common questions of law and fact, which predominate over any questions affecting individual Nationwide and Statewide Class members, including, without limitation:

   a.     whether GM engaged in the conduct alleged herein;

   b.     whether GM's alleged conduct violates applicable law;

c. whether GM designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

d. whether GM misled Nationwide and Statewide Class members about the quality of the liftgate in the Class Vehicles;

e. whether the Class Vehicles contain the Power Liftgate Defect alleged herein;

f. whether GM had actual or imputed knowledge about the alleged defect but failed to disclose it to Plaintiffs and the other Nationwide and Statewide Class members;

g. whether GM's omissions and concealment regarding the quality of the Class Vehicles were likely to deceive Statewide Class members in violation of the state consumer protection statutes alleged herein;

h. whether GM breached its express warranties to the Nationwide and Statewide Class members with respect to the Class Vehicles;

i. whether GM breached its implied warranties to the Nationwide and Statewide Class members with respect to the Class Vehicles;

j. whether Nationwide and Statewide Class members overpaid for their Class Vehicles as a result of the defect alleged herein;

k.      whether Nationwide and Statewide Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, exemplary damages, and/or other relief; and

l.      the amount and nature of relief to be awarded to Plaintiffs and the other Nationwide and Statewide Class members.

132.   **Typicality – Federal Rule of Civil Procedure 23(a)(3).**  Plaintiffs' claims are typical of the other Nationwide and Statewide Class members' claims because Plaintiffs and the Nationwide and Statewide Class members purchased or leased Class Vehicles that suffer from the Power Liftgate Defect.   Neither Plaintiffs nor the other Nationwide and Statewide Class Members would have purchased the Class Vehicles, or, alternatively, would have paid less for the Class Vehicles, had they known of the Power Liftgate Defect.  Plaintiffs and the other Nationwide and Statewide Class members suffered damages as a direct proximate result of the same wrongful practices in which GM engaged.  Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the other Nationwide and Statewide Class members.

133.   **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).**  Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Nationwide and Statewide Classes that they respectively seek to represent, Plaintiffs have retained

counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. The Nationwide and Statewide Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

134. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** GM has acted or refused to act on grounds generally applicable to Plaintiffs and the other Nationwide and Statewide Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Nationwide and Statewide Class members as a whole.

135. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Nationwide and Statewide Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against GM, so it would be impracticable for the Nationwide and Statewide Class members to individually seek redress for GM's wrongful conduct. Even if the Nationwide and Statewide Class members could afford litigation the court system could not. Individualized

litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.   CLAIMS FOR RELIEF

**A.      Claim Brought on Behalf of the Nationwide Class**

### COUNT 1
### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### 15 U.S.C. §§ 2301, *et seq.*

136.   Plaintiffs repeat and reallege paragraphs 1-135 as if fully set forth herein.

137.   Plaintiffs bring this Count individually and on behalf of the other members of the Nationwide Class (the "Class," for purposes of this Count).

138.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. §§ 1332(a) and (d).

139.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

140.   GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

141.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

142.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

143.   In its Limited Warranty, GM expressly warranted, for each of the Class Vehicles, that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period.  As stated in its 2012 Chevrolet Limited Warranty guide, the Limited Warranty provides:

> This warranty is for GM vehicles registered in the United States and normally operated in the United States and Canada, and is provided to the original and any subsequent owners of the vehicle during the warranty period.
>
> The warranty covers repairs to correct any vehicle defect . . . related to materials or workmanship occurring during the warranty period.
>
> Warranty repairs, including towing, parts, and labor, will be made at no charge.

144.   GM's Limited Warranty is a written warranty within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).  The Class Vehicles' implied warranty of merchantability is covered by 15 U.S.C. § 2301(7).

145.   With respect to Class members' purchases or leases of the Class Vehicles, the terms of GM's written warranty and implied warranty became part of

the basis of the bargain between GM, on the one hand, and Plaintiffs and each of the other Class members, on the other.

146.   GM breached these warranties as described in more detail above. Without limitation, the Class Vehicles are equipped with defective power liftgate struts as described above.

147.   Plaintiffs, individually and on behalf of the other Class members, notified GM of the Power Liftgate Defect, and its corresponding breach of warranties, through a notice letter dated December 4, 2017, and delivered by United States Certified Mail to GM's headquarters in Detroit, Michigan on December 8, 2017.  GM was also provided notice of the Power Liftgate Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge.  GM has not taken any appropriate measures to cure its warranty breaches to Plaintiffs and the other Class members.

148.   At the time of sale or lease of each Class Vehicle, GM knew, should have known, or was reckless in not knowing of the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design.  Under the circumstances, the remedies available under any informal settlement procedure would be inadequate, and any requirement that Plaintiffs and the other Class members resort to an informal dispute resolution

procedure and/or afford GM a reasonable opportunity to cure its breach of warranties is excused and thus deemed satisfied.

149.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy in this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

150.   As a direct and proximate result of GM's breaches of its Limited Warranty and the implied warranty of merchantability, Plaintiffs and the other Class members have sustained damages in an amount to be determined at trial.

151.   Plaintiffs, individually and on behalf of all the other Class members, seek all damages permitted by law, including the diminution in value of their vehicles, in an amount to be proven at trial.

**B.    Claims Brought on Behalf of the Michigan Class**

**COUNT 2**
**VIOLATIONS OF THE MICHIGAN**
**CONSUMER PROTECTION ACT**
**Mich. Comp. Laws §§ 445.901-445.922.**

152.   Plaintiff Miller ("Plaintiff," for purposes of the Michigan Class's claims) repeats and realleges paragraphs 1-135 as if fully set forth herein.

153.   Plaintiff brings this Count individually and on behalf of the other members of the Michigan Class (the "Class," for purposes of this Count).

51

154.   The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce …." Mich. Comp. Laws § 445.903.

155.   By the conduct described in detail above and incorporated herein, GM engaged in unfair or deceptive acts in violation of the Michigan CPA.  GM knew or should have known that its conduct violated the Michigan CPA.

156.   GM's intentional and knowing omissions regarding the Power Liftgate Defect, described above, that causes liftgates to collapse without warning, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

157.   GM intended for Plaintiff and the other Class members to rely on GM's omissions regarding the Power Liftgate Defect.

158.   Plaintiff and the other Class members justifiably acted or relied to their detriment upon GM's omissions of fact concerning the above-described Power Liftgate Defect, as evidenced by Plaintiff and the other Class members' purchases of Class Vehicles.

159.   Had GM disclosed all material information regarding the Power Liftgate Defect to Plaintiff and the other Class members, Plaintiff and the other Class members would not have purchased or leased Class Vehicles or would have paid less to do so.

160. GM's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other Class members.

161. In addition to being deceptive, GM's business practices were unfair because GM knowingly sold Plaintiff and the other Class members Class Vehicles with a defective liftgate that was essentially unusable for the purposes for which it was sold. The injuries to Plaintiff and the other Class members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and the other Class members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the Power Liftgate Defect, the injury is not one that Plaintiff or the other Class members could have reasonably avoided.

162. As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiff and the other Class members have suffered loss and actual damages. Plaintiff and the other Class members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the Power Liftgate Defect been disclosed. Plaintiff and the other Class members also suffered diminished value of their vehicles.

163. Pursuant to Mich. Comp. Laws § 445.911, Plaintiff and the other Class members seek an order enjoining GM's unfair and/or deceptive acts or

practices and awarding damages, including trebled and punitive damages, as well as attorneys' fees, costs, and any other just and proper relief available under the Michigan CPA.

## COUNT 3
### BREACH OF EXPRESS WARRANTY
### Mich. Comp. Laws § 440.2313

164.   Plaintiff Miller ("Plaintiff," for purposes of the Michigan Class's claims) repeats and realleges paragraphs 1-135 as if fully set forth herein.

165.   Plaintiff brings this Count individually and on behalf of the other members of the Michigan Class (the "Class," for purposes of this Count).

166.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Mich. Comp. Laws §§ 440.2314 and 440.2862, and a "seller" of motor vehicles under

§§ 440.2314 and 440.2313.

167.   With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Mich. Comp. Laws §§ 440.2862.

168.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2314, 440.2862, and 440.2313.

169.   In its Limited Warranty, GM expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became

apparent during the warranty period. As stated in the 2012 Chevrolet Limited

Warranty guide, the Limited Warranty provides:

> This warranty is for GM vehicles registered in the United States and normally operated in the United States and Canada, and is provided to the original and any subsequent owners of the vehicle during the warranty period.
>
> The warranty covers repairs to correct any vehicle defect . . . related to materials or workmanship occurring during the warranty period.
>
> Warranty repairs, including towing, parts, and labor, will be made at no charge.

170. GM's Limited Warranty formed the basis of the bargain that was

reached when Plaintiff and the other Class members purchased or leased their

Class Vehicles equipped with the defective liftgate.

171. GM breached the express warranty to repair defects in materials and

workmanship within the Class Vehicles. GM has not repaired, and has been

unable to repair, the Class Vehicles' materials and workmanship defects.

172. Plaintiff Miller, individually and on behalf of the other Class

members, notified GM of the Power Liftgate Defect, and its corresponding breach

of warranties, through a notice letter dated December 4, 2017, and delivered by

United States Certified Mail to GM's headquarters in Detroit, Michigan on

December 8, 2017. GM was also provided notice of the Power Liftgate Defect

through numerous complaints filed against it directly and through its dealers, as

well as its own internal engineering knowledge. GM has not taken any appropriate

measures to cure its warranty breaches to Plaintiff and the other Class members.

173.   Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

174.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

175.   Also, as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

176.   Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

177.   As a direct and proximate result of GM's breach of express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT 4
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### Mich. Comp. Laws §§ 440.2314 and 440.2862

178.   Plaintiff Miller ("Plaintiff," for purposes of the Michigan Class' claims) repeats and realleges paragraphs 1-135 as if fully set forth herein.

179.   Plaintiff brings this Count individually and on behalf of the other members of the Michigan Class (the "Class," for purposes of this Count).

180.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Mich. Comp. Laws §§ 440.2314 and 440.2862, and a "seller" of motor vehicles under

§ 440.2314.

181.   With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Mich. Comp. Laws §§ 440.2862.

182.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2314 and 440.2862.

183.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied in law

pursuant to Mich. Comp. Laws

§§ 440.2314 and 440.2862.

184.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used.

185.   The ordinary purpose of the Class Vehicles is the safe transportation of goods.   The Power Liftgate Defect renders the Class Vehicles unfit for this purpose.

186.   Plaintiff Miller, individually and on behalf of the other Class members, notified GM of the Power Liftgate Defect, and its corresponding breach of warranties, through a notice letter dated December 4, 2017, and delivered by United States Certified Mail to GM's headquarters in Detroit, Michigan on December 8, 2017.   GM was also provided notice of the Power Liftgate Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge.   GM has not taken any appropriate measures to cure its warranty breaches to Plaintiff and the other Class members.

187.   Plaintiff and the other Class members suffered injuries due to the defective nature of the Class Vehicles and GM's breach of the implied warranty of merchantability.

188.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

## COUNT 5
## FRAUDULENT OMISSION

189.   Plaintiff Miller ("Plaintiff," for purposes of the Michigan Class's claims) repeats and realleges paragraphs 1-135 as if fully set forth herein.

190.   Plaintiff brings this Count individually and on behalf of the other members of the Michigan Class (the "Class," for purposes of this Count).

191.   GM was aware of the Power Liftgate Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other Class members.

192.   Having been aware of the Power Liftgate Defect within the Class Vehicles, and having known that Plaintiff and the other Class members could not have reasonably been expected to know of the Power Liftgate Defect, GM had a duty to disclose the defect to Plaintiff and the other Class members in connection with the sale or lease of the Class Vehicles.

193.   GM did not disclose the Power Liftgate Defect within the Class vehicles to Plaintiff and the other Class members in connection with the sale of the Class Vehicles.

194.   For the reasons set forth above, the Power Liftgate Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

195.   In purchasing the Class Vehicles, Plaintiff and the other Class members reasonably relied on GM to disclose known material defects with respect to the Class Vehicles.

196.   Had Plaintiff and the other Class members known of the Power Liftgate Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

197.   Through its omissions regarding the Power Liftgate Defect within the Class Vehicles, GM intended to induce, and did induce, Plaintiff and the other Class members to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

198.   As a direct and proximate result of GM's omissions, Plaintiff and the other Class members either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Power Liftgate Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

## COUNT 6
## UNJUST ENRICHMENT

199.  Plaintiff Miller ("Plaintiff," for purposes of the Michigan Class's claims) repeats and realleges paragraphs 1-135 as if fully set forth herein.

200.  Plaintiff brings this Count individually and on behalf of the other members of the Michigan Class (the "Class," for purposes of this Count).

201.  GM has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to GM's concealment of the Power Liftgate Defect, and Plaintiff and the other Class members have overpaid for these vehicles.

202.  GM has received and retained unjust benefits from Plaintiff and the other Class members, and inequity has resulted.

203.  It is inequitable and unconscionable for GM to retain these benefits.

204.  Because GM concealed its fraud and deception, Plaintiff and the other Class members were not aware of the true facts concerning the Class Vehicles and did not benefit from GM's misconduct.

205.  GM knowingly accepted the unjust benefits of its wrongful conduct.

206.  As a result of GM's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other Class members in an amount to be proven at trial.

**C.      Claims Brought on Behalf of the Illinois Class**

<u>COUNT 7</u>
**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD
AND DECEPTIVE BUSINESS PRACTICES ACT
815 Ill. Comp. Stat. 505/1, *et seq.*

207.   Plaintiff Graham ("Plaintiff," for purposes of the Illinois Class's claims) repeats and realleges paragraphs 1-135 as if fully set forth herein.

208.   Plaintiff brings this claim individually and on behalf of the other members of the Illinois Class (the "Class," for purposes of this Count).

209.   The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2, states that, "[u]nfair methods of competition and unfair or deceptive acts or practices . . . are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby."

210.   By the conduct described in detail above and incorporated herein, GM engaged in unfair or deceptive acts in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act.

211.   GM's omissions regarding the Power Liftgate Defect, described above, that causes liftgates to collapse without warning, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

212. GM intended for Plaintiff and the other Class members to rely on GM's omissions regarding the Power Liftgate Defect.

213. Plaintiff and the other Class members justifiably acted or relied to their detriment on GM's omissions of fact concerning the above-described Power Liftgate Defect as evidenced by Plaintiff and the other Class members' purchases of Class Vehicles.

214. Had GM disclosed all material information regarding the Power Liftgate Defect to Plaintiff and the other Class members, Plaintiff and the other Class members would not have purchased or leased Class Vehicles or would have paid less to do so.

215. GM's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

216. In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiff and the other Class members Class Vehicles with a defective liftgate that was essentially unusable for the purposes for which they were sold. The injuries to Plaintiff and the other Class members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and the other Class members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the Power Liftgate Defect, the

injury is not one that Plaintiff or the other Class members could have reasonably avoided.

217.   As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiff and the other Class members have suffered loss and actual damages.  Plaintiff and the other Class members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the Power Liftgate Defect been disclosed.  Plaintiff and the other Class members also suffered diminished value of their vehicles.  Plaintiff and the other Class members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under 815 Ill Comp. Stat. 505/1, *et seq.*

## COUNT 8
## BREACH OF EXPRESS WARRANTY
### 810 Ill. Comp. Stat. 5/2-313 and 5/2A-210

218.   Plaintiff Graham ("Plaintiff," for the purposes of the Illinois Class's claims) repeats and realleges paragraphs 1-135 as if fully set forth herein.

219.   Plaintiff brings this Count individually and on behalf of the other members of the Illinois Class (the "Class," for purposes of this Count).

220.   GM is and was at all relevant times a merchant with respect to the Class Vehicles.

221.   In its Limited Warranty, GM expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects became apparent during the warranty period.   As stated in the 2012 Chevrolet Limited Warranty guide, the Limited Warranty provides:

> This warranty is for GM vehicles registered in the United States and normally operated in the United States and Canada, and is provided to the original and any subsequent owners of the vehicle during the warranty period.
>
> The warranty covers repairs to correct any vehicle defect . . . related to materials or workmanship occurring during the warranty period.
>
> Warranty repairs, including towing, parts, and labor, will be made at no charge.

222.   GM's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with the defective liftgate.

223.   GM breached its express warranty to repair defects in materials and workmanship within the Class Vehicles.   GM has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects.

224.   Plaintiff Graham, individually and on behalf of the other Class members, notified GM of the Power Liftgate Defect, and its corresponding breach of warranties, through a notice letter dated December 4, 2017, and delivered by United States Certified Mail to GM's headquarters in Detroit, Michigan on December 8, 2017.   GM was also provided notice of the Power Liftgate Defect through numerous complaints filed against it directly and through its dealers, as

well as its own internal engineering knowledge.  GM has not taken any appropriate measures to cure its warranty breaches to Plaintiff and the other Class members.

225.   Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

226.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

## COUNT 9
## FRAUDULENT OMISSION

227.   Plaintiff Graham ("Plaintiff," for purposes of the Illinois Class's claims) repeats and realleges paragraphs 1-135 as if fully set forth herein.

228.   Plaintiff brings this Count individually and on behalf of the other members of the Illinois Class (the "Class," for purposes of this Count).

229.   GM was aware of the Power Liftgate Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other Class members.

230.   Having been aware of the Power Liftgate Defect within the Class Vehicles, and having known that Plaintiff and the other Class members could not

have reasonably been expected to know of the Power Liftgate Defect, GM had a duty to disclose the defect to Plaintiff and the other Class members in connection with the sale or lease of the Class Vehicles.

231. GM did not disclose the Power Liftgate Defect within the Class Vehicles to Plaintiff and the other Class members in connection with the sale of the Class Vehicles.

232. For the reasons set forth above, the Power Liftgate Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

233. In purchasing the Class Vehicles, Plaintiff and the other Class members reasonably relied on GM to disclose known material defects with respect to the Class Vehicles.

234. Had Plaintiff and the other Class members known of the Power Liftgate Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

235. Through its omissions regarding the Power Liftgate Defect within the Class Vehicles, GM intended to induce, and did induce, Plaintiff and the other Class members to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

236.   As a direct and proximate result of GM's omissions, Plaintiff and the other Class members either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Power Liftgate Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

**COUNT 10**
**UNJUST ENRICHMENT**

237.   Plaintiff Graham ("Plaintiff," for purposes of the Illinois Class's claims) repeats and realleges paragraphs 1-135 as if fully set forth herein.

238.   Plaintiff brings this Count individually and on behalf of the other members of the Illinois Class (the "Class," for purposes of this Count).

239.   GM has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to GM's concealment of the Power Liftgate Defect, and Plaintiff and the other Class members have overpaid for these vehicles.

240.   GM has received and retained unjust benefits from Plaintiff and the other Class members, and inequity has resulted.

241.   It is inequitable and unconscionable for GM to retain these benefits.

242.   Because GM concealed its fraud and deception, Plaintiff and the other Class members were not aware of the true facts concerning the Class Vehicles and did not benefit from GM's misconduct.

243. GM knowingly accepted the unjust benefits of its wrongful conduct.

244. As a result of GM's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other Class members in an amount to be proven at trial.

**D. Claims Brought on Behalf of the Massachusetts Class**

<u>COUNT 11</u>
**VIOLATIONS OF THE MASSACHUSETTS
REGULATION OF BUSINESS PRACTICES FOR CONSUMER
PROTECTION ACT
Mass Gen. Laws ch. 93A, §§ 1, *et seq*.**

245. Plaintiff Leonard ("Plaintiff," for purposes of the Massachusetts Class's claims) repeats and realleges paragraphs 1-135 as if fully set forth herein.

246. Plaintiff brings this Count individually and on behalf of the other members of the Massachusetts Class (the "Class," for purposes of this Count).

247. The Massachusetts Regulation of Business Practices for Consumer Protection Act prohibits "[u]nfair methods of competition and unfair or deceptive practices in the conduct of any trade or commerce. . . ." Mass Gen. Laws ch. 93A, § 2.

248. By the conduct described in detail above and incorporated herein, GM engaged in unfair or deceptive acts in violation of Mass Gen. Laws ch. 93A, § 2.

249. GM's omissions regarding the Power Liftgate Defect, described above, that causes liftgates to collapse without warning, are material facts that a

reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

250. GM intended for Plaintiff and the other Class members to rely on GM's omissions of fact regarding the Power Liftgate Defect.

251. Plaintiff and the other Class members justifiably acted or relied to their detriment on GM's omissions of fact concerning the above-described Power Liftgate Defect, as evidenced by Plaintiff and the other Class members' purchases of Class Vehicles.

252. Had GM disclosed all material information regarding the Power Liftgate Defect to Plaintiff and the other Class members, Plaintiff and the other Class members would not have purchased or leased Class Vehicles or would have paid less to do so.

253. GM's omissions deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other Class members.

254. In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiff and the other Class members Class Vehicles with a defective liftgate that was essentially unusable for the purposes for which it was sold. The injuries to Plaintiff and the other Class members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and

the other Class members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the Power Liftgate Defect, the injury is not one that Plaintiff or the other Class members could have reasonably avoided.

255.    As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiff and the other Class members have suffered loss and actual damages.  Plaintiff and the other Class members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the Power Liftgate Defect been disclosed.  Plaintiff and the other Class members also suffered diminished value of their vehicles.  Plaintiff and the other Class members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under Mass Gen. Laws ch. 93A, § 9.

## COUNT 12
## BREACH OF EXPRESS WARRANTY
### Mass Gen. Laws ch. 106, §§ 2-313 and 2A-210

256.    Plaintiff Leonard ("Plaintiff," for purposes of the Massachusetts Class's claims) repeats and realleges paragraphs 1-135 as if fully set forth herein.

257.    Plaintiff brings this Count individually and on behalf of the other members of the Massachusetts Class (the "Class," for purposes of this Count).

258.   GM is and was at all relevant times a merchant with respect to the Class Vehicles.

259.   In its Limited Warranty, GM expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period.   As stated in the 2012 Chevrolet Limited Warranty guide, the Limited Warranty provides:

> This warranty is for GM vehicles registered in the United States and normally operated in the United States and Canada, and is provided to the original and any subsequent owners of the vehicle during the warranty period.
>
> The warranty covers repairs to correct any vehicle defect . . . related to materials or workmanship occurring during the warranty period.
>
> Warranty repairs, including towing, parts, and labor, will be made at no charge.

260.   GM's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with the defective liftgate.

261.   GM breached the express warranty to repair defects in materials and workmanship within the Class Vehicles.   GM has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects.

262.   Plaintiff Leonard, individually and on behalf of the other Class members, notified GM of the Power Liftgate Defect, and its corresponding breach of warranties, through a notice letter dated December 4, 2017, and delivered by

United States Certified Mail to GM's headquarters in Detroit, Michigan on December 8, 2017.  GM was also provided notice of the Power Liftgate Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge.  GM has not taken any appropriate measures to cure its warranty breaches to Plaintiff and the other Class members.

263.   Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

264.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies allowable by law.

265.   Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

266.   Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and the other Class members' remedies would be insufficient to make them whole.

267.   As a direct and proximate result of GM's breach of its express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT 13
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### Mass Gen. Laws ch. 106, §§ 2-314 and 2A-212

268.   Plaintiff Leonard ("Plaintiff," for purposes of the Massachusetts Class's claims) repeats and realleges paragraphs 1-135 as if fully set forth herein.

269.   Plaintiff brings this Count individually and on behalf of the other members of the Massachusetts Class (the "Class," for purposes of this Count).

270.   GM is and was at all relevant times a merchant with respect to motor vehicles under Mass Gen. Laws ch. 106, §§ 2-104 and 2A-103.

271.   Pursuant to Mass Gen. Laws ch. 106, §§ 2-314 and 2A-212, a warranty that the Class Vehicles were in merchantable condition was implied by

law, and the Class Vehicles were bought and sold subject to an implied warranty of merchantability.

272.  The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used.

273.  The ordinary purpose of the Class Vehicles is the safe transportation of goods.  The Power Liftgate Defect renders the Class Vehicles unfit for this purpose.

274.  Plaintiff Leonard, individually and on behalf of the other Class members, notified GM of the Power Liftgate Defect, and its corresponding breach of warranties, through a notice letter dated December 4, 2017, and delivered by United States Certified Mail to GM's headquarters in Detroit, Michigan on December 8, 2017.  GM was also provided notice of the Power Liftgate Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge.  GM has not taken any appropriate measures to cure its warranty breaches to Plaintiff and the other Class members.

275.  Plaintiff and the other Class members suffered injuries due to the defective nature of the Class Vehicles and GM's breach of the warranty of merchantability.

276.   As a direct and proximate result of GM's breach of the warranty of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

## COUNT 14
## FRAUDULENT OMISSION

277.   Plaintiff Leonard ("Plaintiff," for purposes of the Massachusetts Class's claims) repeats and realleges paragraphs 1-135 as if fully set forth herein.

278.   Plaintiff brings this Count individually and on behalf of the other members of the Massachusetts Class (the "Class," for purposes of this Count).

279.   GM was aware of the Power Liftgate Defect within Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other Class members.

280.   Having been aware of the Power Liftgate Defect within the Class Vehicles, and having known that Plaintiff and the other Class members could not have reasonably been expected to know of the Power Liftgate Defect, GM had a duty to disclose the defect to Plaintiff and the other Class members in connection with the sale or lease of the Class Vehicles.

281.   GM did not disclose the Power Liftgate Defect within the Class Vehicles to Plaintiff and the other Class members in connection with the sale of the Class Vehicles.

282.   For the reasons set forth above, the Power Liftgate Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

283.   In purchasing the Class Vehicles, Plaintiff and the other Class members reasonably relied on GM to disclose known material defects with respect to the Class Vehicles.

284.   Had Plaintiff and the other Class members known of the Power Liftgate Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

285.   Through its omissions regarding the Power Liftgate Defect within the Class Vehicles, GM intended to induce, and did induce, Plaintiff and the other Class members to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

286.   As a direct and proximate result of GM's omissions, Plaintiff and the other Class members either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Power Liftgate Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

## COUNT 15
## UNJUST ENRICHMENT

287. Plaintiff Leonard ("Plaintiff," for purposes of the Massachusetts Class's claims) repeats and realleges paragraphs 1-135 as if fully set forth herein.

288. Plaintiff brings this Count individually and on behalf of the other members of the Massachusetts Class (the "Class," for purposes of this Count).

289. GM has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to GM's concealment of the Power Liftgate Defect, and Plaintiff and the other Class members have overpaid for these vehicles.

290. GM has received and retained unjust benefits from Plaintiff and the other Class members, and inequity has resulted.

291. It is inequitable and unconscionable for GM to retain these benefits.

292. Because GM concealed its fraud and deception, Plaintiff and the other Class members were not aware of the true facts concerning the Class Vehicles and did not benefit from GM's misconduct.

293. GM knowingly accepted the unjust benefits of its wrongful conduct.

294. As a result of GM's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other Class members in an amount to be proven at trial.

E.     **Claims Brought on Behalf of the Oregon Class**

<u>COUNT 16</u>
**VIOLATIONS OF THE OREGON UNLAWFUL TRADE PRACTICES LAW**
**Or. Rev. Stat. §§ 646.605, *et seq.***

345.   Plaintiff Luse ("Plaintiff," for purposes of the Oregon Class's claims) repeats and realleges paragraphs 1-135 as if fully set forth herein.

346.   Plaintiff brings this Count individually and on behalf of the other members of the Oregon Class (the "Class," for purposes of this Count).

347.   The Oregon Unlawful Trade Practices Law broadly prohibits "unfair or deceptive conduct in trade or commerce."  Or. Rev. Stat. § 646.608(u).

348.   By the conduct described in detail above and incorporated herein, GM engaged in unfair or deceptive conduct in violation of the Oregon Unlawful Trade Practices Law.

349.   GM's omissions regarding the Power Liftgate Defect, described above, that causes liftgates to collapse without warning, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

350.   GM intended for Plaintiff and the other Class members to rely on GM's omissions regarding the Power Liftgate Defect.

351.   Plaintiff and the other Class members justifiably acted or relied to their detriment on GM's omissions of fact concerning the above-described Power

Liftgate Defect, as evidenced by Plaintiff and the other Class members' purchases of Class Vehicles.

352. Had GM disclosed all material information regarding the Power Liftgate Defect to Plaintiff and the other Class members, Plaintiff and the other Class members would not have purchased or leased Class Vehicles or would have paid less to do so.

353. GM's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

354. In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiff and the other Class members Class Vehicles with a defective liftgate that was essentially unusable for the purposes for which it was sold. The injuries to Plaintiff and the other Class members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and the other Class members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the Power Liftgate Defect, the injury is not one that Plaintiff or the other Class members could have reasonably avoided.

355. As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiff and the other Class members have suffered loss and actual

damages. Plaintiff and the other Class members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or alternatively, would have paid less for them had the truth about the Power Liftgate Defect been disclosed. Plaintiff and the other Class members also suffered diminished value of their vehicles. Plaintiff and the other Class members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under the Oregon Unlawful Trade Practices Law.

## COUNT 17
## BREACH OF EXPRESS WARRANTY
### Or. Rev. Stat. §§ 72.3130 and 72a.2100

356. Plaintiff Luse ("Plaintiff," for the purposes of the Oregon Class's claims) repeats and realleges paragraphs 1-135 as if fully set forth herein.

357. Plaintiff brings this Count individually and on behalf of the other members of the Oregon Class (the "Class," for purposes of this Count).

358. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Or. Rev. Stat. §§ 72.1040 and 72.1030, and a "seller" of motor vehicles under § 72.1030.

359. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Or. Rev. Stat. § 72a.1030.

360. The Class Vehicles are and were at all relevant times "goods" within the meaning of Or. Rev. Stat. 72.1050 and 72a.1030.

361.   In its Limited Warranty, GM expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period.  As stated in the 2012 Chevrolet Limited Warranty guide, the Limited Warranty provides:

> This warranty is for GM vehicles registered in the United States and normally operated in the United States and Canada, and is provided to the original and any subsequent owners of the vehicle during the warranty period.
>
> The warranty covers repairs to correct any vehicle defect . . . related to materials or workmanship occurring during the warranty period.
>
> Warranty repairs, including towing, parts, and labor, will be made at no charge.

362.   GM's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with the defective liftgate.

363.   GM breached the express warranty to repair defects in materials and workmanship within the Class Vehicles.  GM has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects.

364.   Plaintiff, individually and on behalf of the other Class members, notified GM of the Power Liftgate Defect, and its corresponding breach of warranties, through a notice letter dated December 4, 2017, and delivered by United States Certified Mail to GM's headquarters in Detroit, Michigan on December 8, 2017.  GM was also provided notice of the Power Liftgate Defect through numerous complaints filed against it directly and through its dealers, as

well as its own internal engineering knowledge.  GM has not taken any appropriate measures to cure its warranty breaches to Plaintiff and the other Class members.

365.  Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

366.  Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

367.  Also, as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

368.  Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the

other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

369.   As a direct and proximate result of GM's breach of express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT 18
## FRAUDULENT OMISSION

370.   Plaintiff Luse ("Plaintiff," for purposes of the Oregon Class's claims) repeats and realleges paragraphs 1-135 as if fully set forth herein.

371.   Plaintiff brings this Count individually and on behalf of the other members of the Oregon Class (the "Class," for purposes of this Count).

372.   GM was aware of the Power Liftgate Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other Class members.

373.   Having been aware of the Power Liftgate Defect within the Class vehicles, and having known that Plaintiff and the other Class members could not have reasonably been expected to know of the Power Liftgate Defect, GM had a duty to disclose the defect to Plaintiff and the other Class members in connection with the sale or lease of the Class Vehicles.

374.   GM did not disclose the Power Liftgate Defect within the Class Vehicles to Plaintiff and the other Class members in connection with the sale of the Class Vehicles.

375.   For the reasons set forth above, the Power Liftgate Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

376.   In purchasing the Class Vehicles, Plaintiff and the other Class members reasonably relied on GM to disclose known material defects with respect to the Class Vehicles.

377.   Had Plaintiff and the other Class members known of the Power Liftgate Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

378.   Through its omissions regarding the Power Liftgate Defect within the Class Vehicles, GM intended to induce, and did induce, Plaintiff and the other Class members to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

379.   As a direct and proximate result of GM's omissions, Plaintiff and the other Class members either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Power Liftgate Defect had been disclosed

to them, and, therefore, have incurred damages in an amount to be determined at trial.

## COUNT 19
## UNJUST ENRICHMENT

380.   Plaintiff Luse ("Plaintiff," for purposes of the Oregon Class's claims) repeats and realleges paragraphs 1-135 as if fully set forth herein.

381.   Plaintiff brings this Count individually and on behalf of the other members of the Oregon Class (the "Class," for purposes of this Count).

382.   GM has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to GM's concealment of the Power Liftgate Defect, and Plaintiff and the other Class members have overpaid for these vehicles.

383.   GM has received and retained unjust benefits from Plaintiff and the other Class members, and inequity has resulted.

384.   It is inequitable and unconscionable for GM to retain these benefits.

385.   Because GM concealed its fraud and deception, Plaintiff and the other Class members were not aware of the true facts concerning the Class Vehicles and did not benefit from GM's misconduct.

386.   GM knowingly accepted the unjust benefits of its wrongful conduct.

387.   As a result of GM's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other Class members in an amount to be proven at trial.

**F.   Claims Brought on Behalf of the Washington Class**

## COUNT 20
## VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT
**Wash. Rev. Code §§ 19.86.010,** *et seq.*

388.   Plaintiff Mike Arnadi ("Plaintiff," for purposes of the Washington Class's claims) repeats and realleges paragraphs 1-135 as if fully set forth herein.

389.   Plaintiff brings this Count individually and on behalf of the other members of the Washington Class (the "Class," for purposes of this Count).

390.   The Washington Consumer Protection Act broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Wash. Rev. Code. § 19.86.020.

391.   By the conduct described in detail above and incorporated herein, GM engaged in unfair or deceptive acts in violation of the Washington Consumer Protection Act.

392.   GM's omissions regarding the Power Liftgate Defect, described above, that causes liftgates to collapse without warning, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

393.   GM intended for Plaintiff and the other Class members to rely on GM's omissions regarding the Power Liftgate Defect.

394.   Plaintiff and the other Class members justifiably acted or relied to their detriment on GM's omissions of fact concerning the above-described Power Liftgate Defect, as evidenced by Plaintiff and the other Class members' purchases of Class Vehicles.

395.   Had GM disclosed all material information regarding the Power Liftgate Defect to Plaintiff and the other Class members, Plaintiff and the other Class members would not have purchased or leased Class Vehicles or would have paid less to do so.

396.   GM's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

397.   In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiff and the other Class members Class Vehicles with a defective liftgate that was essentially unusable for the purposes for which it was sold.   The injuries to Plaintiff and the other Class members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and the other Class members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the Power Liftgate Defect, the

injury is not one that Plaintiff or the other Class members could have reasonably avoided.

398.   As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiff and the other Class members have suffered loss and actual damages.  Plaintiff and the other Class members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the Power Liftgate Defect been disclosed.  Plaintiff and the other Class members also suffered diminished value of their vehicles.  Plaintiff and the other Class members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under Wash. Rev. Code § 19.86.090.

## COUNT 21
## BREACH OF EXPRESS WARRANTY
### Wash. Rev. Code § 62A.2-313 and 62A.2A-210

399.   Plaintiff Mike Arnadi ("Plaintiff," for purpose of the Washington Class's claims) repeat and reallege paragraphs 1-135 as if fully set forth herein.

400.   Plaintiff brings this Count individually and on behalf of the other members of the Washington Class (the "Class," for purposes of this Count).

401.   GM is and was at all relevant times a merchant with respect to the Class Vehicles.

402.   In its Limited Warranty, GM expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period.   As stated in the 2012 Chevrolet Limited Warranty guide, the Limited Warranty provides:

> This warranty is for GM vehicles registered in the United States and normally operated in the United States and Canada, and is provided to the original and any subsequent owners of the vehicle during the warranty period.
>
> The warranty covers repairs to correct any vehicle defect . . . related to materials or workmanship occurring during the warranty period.
>
> Warranty repairs, including towing, parts, and labor, will be made at no charge.

403.   GM's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with the defective liftgate.

404.   GM breached the express warranty to repair defects in materials and workmanship within the Class Vehicles.   GM has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects.

405.   Plaintiff, individually and on behalf of the other Class members, notified GM of the Power Liftgate Defect, and its corresponding breach of warranties, through a notice letter dated December 4, 2017, and delivered by United States Certified Mail to GM's headquarters in Detroit, Michigan on December 8, 2017.   GM was also provided notice of the Power Liftgate Defect through numerous complaints filed against it directly and through its dealers, as

well as its own internal engineering knowledge. GM has not taken any appropriate measures to cure its warranty breaches to Plaintiff and the other Class members.

406. Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

407. Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies allowable by law.

408. Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiff and the other Class members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

409. Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such

limited remedy within a reasonable time, and any limitation on Plaintiff and the other Class members' remedies would be insufficient to make them whole.

410.   As a direct and proximate result of GM's breach of its express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT 22
## FRAUDULENT OMISSION

411.   Plaintiff Mike Arnadi ("Plaintiff," for purposes of the Washington Class's claims) repeats and realleges paragraphs 1-135 as if fully set forth herein.

412.   Plaintiff brings this Count individually and on behalf of the other members of the Washington Class (the "Class," for purposes of this Count).

413.   GM was aware of Power Liftgate Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other Class members.

414.   Having been aware of the Power Liftgate Defect within the Class Vehicles, and having known that Plaintiff and the other Class members could not have reasonably been expected to know of the Power Liftgate Defect, GM had a good-faith duty to disclose the defect to Plaintiff and the other Class members in connection with the sale or lease of the Class Vehicles.

415. GM did not disclose the Power Liftgate Defect within the Class Vehicles to Plaintiff and the other Class members in connection with the sale or lease of the Class Vehicles.

416. For the reasons set forth above, the Power Liftgate Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

417. In purchasing the Class Vehicles, Plaintiff and the other Class members reasonably relied on GM to disclose known material defects with respect to the Class Vehicles.

418. Had Plaintiff and the other Class members known of the Power Liftgate Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

419. Through its omissions regarding the Power Liftgate Defect within the Class Vehicles, GM intended to induce, and did induce, Plaintiff and the other Class members to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

420. As a direct and proximate result of GM's omissions, Plaintiff and the other Class members either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Power Liftgate Defect had been disclosed

to them, and, therefore, have incurred damages in an amount to be determined at trial.

### COUNT 23
### UNJUST ENRICHMENT

421.   Plaintiff Mike Arnadi ("Plaintiff," for purposes of the Washington Class's claims) repeats and realleges paragraphs 1-135 as if fully set forth herein.

422.   Plaintiff brings this Count individually and on behalf of the other members of the Washington Class (the "Class," for purposes of this Count).

423.   GM has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to GM's concealment of the Power Liftgate Defect, and Plaintiff and the other Class members have overpaid for these vehicles.

424.   GM has received and retained unjust benefits from Plaintiff and the other Class members, and inequity has resulted.

425.   It is inequitable and unconscionable for GM to retain these benefits.

426.   Because GM concealed its fraud and deception, Plaintiff and the Class members were not aware of the true facts concerning the Class Vehicles and did not benefit from GM's misconduct.

427.   GM knowingly accepted the unjust benefits of its wrongful conduct.

428.   As a result of GM's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other Class members in an amount to be proven at trial.

## VIII.  <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Nationwide Class and the Statewide Classes they respectively seek to represent, respectfully request that the Court enter judgment in their favor and against Defendant, General Motors LLC, as follows:

a.   Declaring that this action is a proper class action, certifying the Nationwide and Statewide Classes as requested herein, designating Plaintiffs as Nationwide and Statewide Class Representatives, and appointing Plaintiffs' attorneys as Class Counsel;

b.   Enjoining GM from continuing the unfair business practices alleged in this Complaint;

c.   Ordering GM to pay actual and statutory damages (including punitive damages) and restitution to Plaintiffs and the other Nationwide and Statewide Class members, as allowable by law;

d.   Ordering GM to pay both pre- and post-judgment interest on any amounts awarded;

e.   Ordering GM to pay attorneys' fees and costs of suit; and

f.      Ordering such other and further relief as may be just and proper.

## IX.  JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

**DATED:**  December 14, 2017

/s/ *E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Dennis A. Lienhardt (P81118)
**THE MILLER LAW FIRM**
950 West University Drive, Suite 300
Rochester, Michigan  48307
Telephone:  248-841-2200
epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com

Adam J. Levitt
John E. Tangren
Daniel R. Ferri
**DICELLO LEVITT & CASEY LLC**
Ten North Dearborn Street, Eleventh Floor
Chicago, Illinois  60602
Telephone:  312-214-7900
alevitt@dlcfirm.com
jtangren@dlcfirm.com
dferri@dlcfirm.com

W. Daniel "Dee" Miles, III
H. Clay Barnett, III
Archie I. Grubb, II
Christopher D. Baldwin
**BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, Alabama  36104
Telephone: 334-269-2343
Dee.Miles@Beasleyallen.com

96

Clay.Barnett@BeasleyAllen.com
Archie.Grubb@Beasleyallen.com
Chris.Baldwin@Beasleyallen.com

Courtney L. Davenport
**THE DAVENPORT LAW FIRM LLC**
18805 Porterfield Way
Germantown, Maryland  20874
Telephone:  703-901-1660
courtney@thedavenportlawfirm.com

*Counsel for Plaintiffs and the Proposed Classes*