UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

AMY MILLER, *et al.*, individually,
and on behalf of all others similarly
situated,

                Plaintiffs,                      Case. No. 17-cv-14032

v.                                        Honorable Thomas L. Ludington
                                              Magistrate Judge Patricia T. Morris

GENERAL MOTORS, LLC,

                Defendant.
_____/

## <u>ORDER GRANTING MOTION TO DISMISS AND DISMISSING COMPLAINT WITHOUT PREJUDICE</u>

On December 14, 2017, Plaintiffs filed a 23-count complaint on behalf of themselves and others similarly situated alleging that they purchased or leased certain GM vehicles with defective power liftgate struts that can unexpectedly fail, causing the liftgate to suddenly fall on people attempting to access the rear compartment. Compl. ¶ 1, ECF No. 1. Plaintiffs purchased or leased their vehicles in Michigan, Illinois, Massachusetts, Oregon, and Washington. The complaint alleges breaches of express and implied warranties, violations of state consumer protection laws, fraudulent omission, and unjust enrichment. On March 5, 2018, Defendant filed the instant Motion to Dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), or for a more definite statement pursuant to rule 12(e). ECF No. 19. Plaintiffs responded on April 9, 2018, and Defendant replied on April 30, 2018. ECF Nos. 27, 28.

# I.

When adjudicating a motion to dismiss for failure to state a claim under rule 12(b)(6), the Court construe's the complaint in the non-movant's favor and accepts all of Plaintiff's factual allegations as true. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). The facts set forth herein are derived from the allegations in Plaintiff's complaint.

The vehicles containing the liftgate defect are: 2010-2012 GMC Acadia, 2010-2012 Buick Enclave, 2010 Saturn Outlook, 2010-2012 Chevrolet Traverse, 2010-2012 Cadillac SRX, 2010-2012 Chevrolet Equinox, and 2010-2012 GMC Terrain (collectively, the "Class Vehicles"). Compl. ¶ 1. "Each of the Class Vehicles shares a common defect: power liftgate struts that prematurely wear because the design allows dirt and debris to compromise the seals on the pressurized cylinder, allowing pressurized gas to escape (the 'Power Liftgate Defect')." *Id.* ¶ 2. The liftgate struts "fail without warning, causing injury to anyone in the path of the liftgate and hindering the owner's ability to use their rear compartment because the liftgate will not remain open." *Id.* GM had notice of the defect since at least 2010, when it issued the first of several "Technical Service Bulletins" (TSBs) to dealers regarding power liftgates. *Id.* ¶ 6. GM "likely had notice and knowledge" of the defects prior to that based on recalls issued by three other auto manufacturers of power liftgate struts from the same supplier, Stabilus, Inc., beginning in 2006. *Id.*

GM did not disclose the defect at the time of purchase, and Plaintiffs purchased their vehicles with the erroneous understanding that they would be safe and reliable. Plaintiff Miller "owns a 2010 Chevrolet Traverse with the Power Liftgate Defect," which was not disclosed to her at the time of the purchase in 2014, despite GM's knowledge of the defect. *Id.* ¶ 19-20. Plaintiff Graham "owns a 2011 Chevrolet Equinox with the Power Liftgate Defect," which was

not disclosed to him at the time of the purchase, despite GM's knowledge of the defect. *Id.* ¶ 22-23. Plaintiff Leonard owns a 2012 Chevrolet Traverse which she purchased in 2012. *Id.* ¶ 25. Within the period of GM's express warranty, the liftgate on Plaintiff Leonard's vehicle "struggled to open and required manual assistance." *Id.* ¶ 26. Plaintiff Luse owns a 2011 GM Terrain which he purchased in 2013. *Id.* ¶ 29. On numerous occasions within the period of GM's express warranty, the power liftgate on Plaintiff Luse's vehicle collapsed unexpectedly, once striking Mr. Luse on the shoulder. *Id.* ¶ 30. Plaintiff Arnadi owns a 2012 Chevrolet Equinox, which he purchased in 2012. *Id.* ¶ 33. The power liftgate on Mr. Arnadi's vehicle "suddenly collapsed from the full-open position on multiple occasions." *Id.* ¶ 34. "On one such occasion, the collapsed liftgate smashed Mr. Arnadi into the vehicles rear bumper" and he was "forced to use his back to raise the liftgate and free himself." *Id.*

The GM owner's manual for the Class Vehicles warns: "You or others could be injured if caught in the path of the power liftgate. Make sure there is no one in the way of the liftgate as it is opening and closing." *Id.* ¶ 42. The GM owner's manual for the Class Vehicles also states: "If you power open the liftgate and the liftgate support struts have lost pressure, the lights will flash and a chime will sound. The liftgate will stay open temporarily, then slowly close. See your dealer/retailer for service before using the liftgate." *Id.* ¶ 43. Plaintiffs alleged that the defect in the liftgates causes them to drop suddenly, with no lights, chimes, or any other user warnings. *Id.*

In July 2010, GM issued a TSB (technical service bulletin) notifying dealers, but not owners, of multiple problems with the power liftgates. *Id.* ¶ 44. Another TSB was issued to GM dealers in June 2013 acknowledging that dirt and debris were wearing the strut seals, and instructing dealers conducting strut replacements to change the orientation of the rod such that the rod faced downward, thereby preventing debris accumulation. *Id.* ¶ 45. GM issued a March

2014 TSB which noted customer complaints related to the liftgates on the 2010-2014 Cadillac SRX, Chevrolet Equinox, and GMC terrain. *Id.* ¶ 47.

In June 2015, GM recalled the 2007-2012 GMC Acadia, 2008 to 2012 Buick Enclave, 2007-2010 Saturn Outlook, and 2009-2012 Chevrolet Traverse. *Id.* at ¶ 48. GM specified that the "vehicles have a condition in which the gas struts that hold the liftgate up may prematurely wear," because the struts "are orientated in a way that allows dirt particles to penetrate between the piston rod and the guiding bushing package." *Id.* ¶ 48. In conjunction with the recall, GM acknowledged that the Prop Rod Recovery system may be unable to prevent a liftgate with prematurely worn gas struts from falling too quickly. *Id.* ¶ 49.

GM's recall was limited to the remedy of a "reflash" (reprogramming) of the liftgate actuator motor control unit with a new software calibration. *Id.* ¶ 7. Dealers were instructed to verify that the liftgate stayed up and, if not, to replace the struts for free within 90 days of the software upgrade. *Id.* ¶ 51. If the struts failed after 90 days, customers were required to pay for the repair. *Id.* GM admitted in its recall notice to the National Highway Traffic Safety Administration (NHTSA) that the struts were defective because they allow dust and dirt to collect in the strut rod seals, causing those seals to fail. *Id.* ¶ 8. GM agreed to replace the struts only if they failed at the time of the repair or within 90 days thereafter. *Id.* ¶ 9. GM's recall was limited to four models, despite GM's knowledge that other models contained the same or similar struts and were the subject of consumer complaints and TSBs. *Id.* ¶ 10. The new software calibration failed to resolve the problem. *Id.* ¶ 11. GM did not recall the 2010-2014 Cadillac SRX, Chevrolet Equinox, and GMC Terrain vehicles, despite acknowledging in a TSB that those vehicles also had struts prone to premature wear. *Id.* ¶ 56.

Plaintiffs' complaint details a number of recalls and NHSTA investigations of Ford, Toyota, and Honda vehicles equipped with struts manufactured by Stabilus, the same company that manufactured GM's struts. *Id.* ¶ 58-81. These NHSTA investigations and recalls took place as early as 2006. Following Honda's 2012 recall, NHTSA opened an Equipment Query Investigation into Stabilus to determine which other companies had purchased the defective struts. *Id.* ¶ 77. In its response, Stabilus stated that it supplied struts for "nearly all vehicles produced in North America" but that no other manufacturer received the "same" struts as those that were recalled. *Id.* "NHTSA closed the investigation, in large part based on Stabilus's claim that most struts that were similar to the recalled struts were aftermarket parts not manufactured by Stabilus." *Id.* ¶ 81. By the end of 2012, the NHTSA had received 28 complaints of sudden falls of power liftgates in GM vehicles, 9 of which were related to vehicles GM subsequently recalled. *Id.* ¶ 85. These consumer complaints included reports of head injuries and a broken wrist. *Id.* ¶ 88.

GM extensively advertised the benefits of their power liftgate. *Id.* ¶ 93. Numerous advertising materials for the Class Vehicles advertised the power liftgate for easy loading and unloading of the rear compartment. *Id.* ¶ 95-100. The brochure for the GMC Terrain reads: "Programmable Power Liftgate Helping you take advantage of its easy cargo access, Terrain offers an available programmable power liftgate. It opens and closes with the touch of a button to the height you select. Electronic obstacle detection can stop and reverse liftgate motion to prevent damage." *Id.* ¶ 99.

## II.

Plaintiffs' complaint contains 23 counts leading to five categories of claims for relief. First, Plaintiffs allege that GM breached its Express Limited Warranty that it would repair or

replace defects in material or workmanship free of charge if they became apparent during the warranty period. Plaintiffs seek redress for the breach of the express warranty pursuant to: 1) the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, et seq.; 2) Mich. Comp. Laws § 440.2313; 3) 810 Ill. Comp. Stat. 5/2-313 and 5/2A-210; 4) Mass Gen. Laws ch. 106, §§ 2-313 and 2A-210; 5) Or. Rev. Stat. §§ 72.3130 and 72a.2100; and 6) Wash. Rev. Code § 62A.2-313 and 62A.2A-210 (count 1, 3, 8, 12, 17, and 21).

Second, Plaintiff alleges that GM breached the Implied Warranty of Merchantability because, at the time of sale and at all times thereafter, the vehicles were not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Plaintiffs seek redress for the breach of the Implied Warranty of Merchantability pursuant to: 1) the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, et seq.; 2) Mich. Comp. Laws §§ 440.2314, 440.2862; and 3) Mass Gen. Laws ch. 106, §§ 2-314 and 2A-212 (count 4 and 13).

Third, Plaintiffs allege that GM violated state consumer protection laws by intentionally and knowingly omitting information regarding the liftgate defect, that would be material to a reasonable person considering whether to purchase the vehicles and how much to pay for them. Plaintiffs allege that they justifiably relied on these omissions and that, had they been aware of the defect, they would have not purchased the vehicles at all or would have paid less for the vehicles. Plaintiffs also allege that GM knowingly sold vehicles with a defective liftgate that was essentially unusable for the purposes for which it was sold. Plaintiffs seek to recover under the Michigan Consumer Protection Act, Mich. Comp. Laws §§ 445.901-445.922 (count 2), the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, et seq. (count 7), the Massachusetts Regulation of Business Practices for Consumer Protection Act,

Mass Gen. Laws ch. 93A, §§ 1, *et seq.* (count 11), the Oregon Unlawful Trade Practices Law, Or. Rev. Stat. §§ 646.605, *et seq.* (count 16), and the Washington Consumer Protection Act, Wash. Rev. Code §§ 19.86.010, et seq. (Count 20).

Fourth, Plaintiffs assert five counts of common law fraudulent omission on behalf of the Michigan, Illinois, Massachusetts, Oregon, and Washington classes (count 5, 9, 14, 18, and 22). The factual allegations giving rise to the fraudulent omission claims are essentially identical to the allegations giving rise to the claims for violations of the state consumer protection statutes.

Finally, Plaintiffs assert five counts of unjust enrichment on behalf of the Michigan, Illinois, Massachusetts, Oregon, and Washington classes (count 6, 10, 15, 19, and 23). In each of these counts Plaintiffs allege that GM has wrongfully benefitted from knowingly selling and leasing defective vehicles at inflated prices due to GM's concealment of the liftgate defect, that it is inequitable and unconscionable for GM to retain these benefits, and that the amount of the unjust enrichment should be disgorged and returned to Plaintiffs.

## III.

A pleading fails to state a claim under Rule 12(b)(6) if it does not contain allegations that support recovery under any recognizable legal theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009). In considering a Rule 12(b)(6) motion, the Court construes the pleading in the non-movant's favor and accepts the allegations of facts therein as true. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). The pleader need not have provided "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In essence, the pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is

plausible on its face" and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678–79 (quotations and citation omitted).

**IV.**

**A.**

Defendant argues that Plaintiffs' express warranty claim fails because the GM Limited Warranty is not an "Express Warranty" under the UCC. Mot. at 7, ECF No. 19.  Rather, Defendant argues that the GM Limited Warranty is a "repair or replace" warranty which "covers repairs to correct any vehicle defect . . . due to materials or workmanship occurring during the warranty period." *Id.* Defendant also contends that Plaintiffs have not pled a breach of the Limited Warranty because they do not allege that: "(i) they experienced the alleged liftgate defect during the warranty period; (ii) they presented their vehicles to GM for repair during the warranty period; and (iii) GM refused or failed to repair their vehicles." *Id.* at 8.

Plaintiff argues that the GM Limited Warranty can be read as either a contractual promise to repair, or as an express warranty, and that it should be construed against the drafter. Resp. at 4, ECF No. 27. Plaintiffs also argue that the existence of an express warranty is typically a jury question, which cannot be summarily decided on the pleadings. *Id.* Plaintiffs also contend that they were excused from availing themselves of the Limited Warranty's exclusive remedy provision because doing so would have been futile. *Id.* at 5.

Under the Michigan Uniform Commercial Code (UCC), express warranties by the seller are created as follows:

> (a) An affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty *that the goods shall conform to the affirmation or promise.*

(b) A description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) A sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model

Mich. Comp. Laws Ann. § 440.2313 (emphasis added).

A "repair-or-replace" provision in a vehicle sales contract that does not "explicitly state that [the] plaintiff's vehicle will be free from defects, but rather states that the manufacturer will repair or replace any defects that arise during the specified period," does not constitute an "express warranty" within the meaning of the Michigan UCC, MCL § 440.2313. *Grosse Pointe Law Firm, PC v. Jaguar Land Rover N. Am., LLC*, 317 Mich. App. 395, 404 (2016), *appeal denied,* 500 Mich. 1017 (2017). Although the repair-or-replace provision is a "promise made by the seller to the buyer which relates to the goods and becomes a part of the basis of the bargain," it does not create an express warranty "that the *goods shall conform to the affirmation or promise.*" *Id.* (emphasis added).

As the court noted in *Grosse Pointe*, "goods cannot 'conform to a promise to repair or replace because such a promise says nothing about the character or quality of the goods, but rather identifies a remedy if the buyer determines that the goods are defective." *Id.*; *see also Garvin, Uncertainty and Error in the Law of Sales: The Article Two Statute of Limitations*, 83 B. U. L. Rev. 345, 379 (2003) ("All [express and implied warranties] go to the quality of the goods at tender. None goes to the remedies, which come about only if a warranty is breached."); DeWitt, *Action Accrual Date for Written Warranties to Repair: Date of Delivery or Date of Failure to Repair?* 17 U. Mich. J.L. Reform 713, 722 n.35 (1984) ("A repair provision relates not to the goods and their quality, but to the manufacturer and its obligation to the purchaser.").

Similarly, under the identical provision in the Illinois UCC, a "limited repair warranty" promising "only that the manufacturer will repair or replace defective parts during the warranty period"—without any promise that the product will "conform to some affirmation, promise, description, sample or model" does not constitute an "express warranty" within the meaning of the Illinois UCC, 810 Ill. Comp. Stat. 5/2-313. *Darne v. Ford Motor Co.*, 2017 WL 3836586, at *5 (N.D. Ill. Sept. 1, 2017) (quoting *Mydlach v. DaimlerChrysler Corp.*, 875 N.E.2d 1047 (Ill. 2007)).

Plaintiffs rely on one case from the Supreme Court of Pennsylvania which reached the opposite conclusion when interpreting an identical provision under Pennsylvania law. Resp. at 5 (citing). However, even that court recognized that a limited "repair-or-replace" warranty "does not create a classic warranty that fits neatly within the UCC view of warranties" because it does not "warran[t] that the *goods* shall conform to the . . . promise." *Nationwide Ins. Co. v. Gen. Motors Corp.*, 625 A.2d 1172 (Pa. 1993).

Neither party has identified any case law from Massachusetts, Oregon, or Washington squarely addressing this issue. Defendant specifically represents that no such case law exists, though Defendant notes that the UCC provisions adopted in these three states are identical to the UCC provisions of Michigan and Illinois. *See* Mass Gen. Laws ch. 106, §§ 2-313; Or. Rev. Stat. §§ 72.3130; Wash. Rev. Code § 62A.2-313.

For the purposes of the instant motion, however, the distinction between an express UCC warranty and a promise to repair or replace is largely a semantic distinction. The more pertinent question is whether Plaintiffs have pled sufficient factual matter to establish that GM has breached the terms of the GM Limited Warranty. It is apparent that Plaintiffs have not pled sufficient facts to establish a breach.

Plaintiffs aver that GM's Limited Warranty contained a promise to repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period. *Id.* ¶¶ 169, 221, 259, 361, 402. Plaintiffs allege that GM breached this warranty because "GM has not repaired, and has been unable to repair, the Class Vehicles[1] materials and workmanship defects." *Id.* ¶¶ 171, 223, 261, 363, 404. Defendant argues that "Plaintiffs have not pled viable claims for breach of GM's Limited Warranty because they do not allege that: (i) they experienced the alleged liftgate defect during the warranty period; (ii) they presented their vehicles to GM for repair during the warranty period; and (iii) GM refused or failed to repair their vehicles." Mot. at 8.

Indeed, with respect to Plaintiffs Miller and Graham, the complaint simply avers that they own vehicles "with the Power Liftgate Defect." *Id.* ¶¶ 19, 22. The complaint alleges that each of the Class Vehicles shares a common defect:

> power liftgate struts that prematurely wear because the design allows dirt and debris to compromise the seals on the pressurized cylinder, allowing pressurized gas to escape (the "Power Liftgate Defect"). Rather than gradually losing the ability to support the liftgate, these struts fail without warning, causing injury to anyone in the path of the liftgate and hindering the owners' ability to use their rear compartment because the liftgate will not remain open.

*Id.* ¶ 2. The complaint also makes it clear, however, that not all vehicles with "the Power Liftgate Defect" actually malfunction. Rather, the complaint avers that each of the Class Vehicles contains "defective power liftgate struts that *can* unexpectedly fail, causing the liftgate to suddenly fall on people attempting to access the rear compartment." *Id.* ¶ 1 (emphasis added). In contrast to the other three named Plaintiffs, the complaint does not allege that Plaintiff Miller

---

[1] The "Class Vehicles" is a defined term in the complaint including the following vehicles: 2010-2012 GMC Acadia, 2010-2012 Buick Enclave, 2010 Saturn Outlook, 2010-2012 Chevrolet Traverse, 2010-2012 Cadillac SRX, 2010-2012 Chevrolet Equinox, and 2010-2012 GMC Terrain (collectively, the "Class Vehicles"). Compl. ¶ 1.

or Graham's liftgates actually malfunctioned. According to the complaint, these vehicles are only defective insofar as they contain power liftgate struts that are prone to premature wear.

With respect to Plaintiffs Leonard,[2] Luse, and Arnadi, the complaint does aver that the liftgates on their vehicles malfunctioned. *Id.* ¶¶ 26, 30, 34. Notably, however, the complaint fails to allege sufficient facts to establish that defects became apparent during the warranty period. The complaint notes that Plaintiffs purchased different model year vehicles at different times. Furthermore, the warranty periods differed depending on the vehicle (3 years, 36,000 miles for Chevy, GMC, and Saturn models, vs. 4 years, 50,000 miles for Buick and Cadillac models). Plaintiff's conclusory assertion that the liftgates exhibited problems "within the period of GM's express warranty" is insufficient. *See Darne v. Ford Motor Co.*, 2017 WL 3836586, at *6 (N.D. Ill. Sept. 1, 2017) (to state a claim for a breach of warranty, plaintiff must "at least state the date it purchased the vehicle in question, as well as either the date that a given problem appeared or the number of miles the vehicle had been driven when the problem appeared, in order to establish that the alleged issues fell within the covered period."). Furthermore, the complaint does not allege that Plaintiffs ever presented their vehicles to GM for repair and that GM refused or was unable to repair their vehicles. Thus, the complaint does not sufficiently allege that a breach occurred.

Plaintiffs also argue that presenting the vehicle for repair would have been futile because the repair/replace remedy failed in its essential purpose. To prove that a repair and replacement remedy failed in its essential purpose, the buyer must show that the seller was either unwilling or unable to repair the vehicle. *Boston Helicopter Charter, Inc. v. Agusta Aviation Corp.*, 767 F. Supp. 363, 373 (D. Mass. 1991); *Young v. Hessel Tractor & Equip. Co.*, 99 Or. App. 262, 267

---

[2] Interestingly, in contrast to the complaint's description of the "Power Liftgate Defect" that is allegedly common to all Class Vehicles, Plaintiff Leonard's liftgate did not "unexpectedly fall" but rather "struggled to open." *Id.* ¶ 26.

(1989); *In re Myford Touch Consumer Litig.*, 2015 WL 5118308, at *4 (N.D. Cal. Aug. 31, 2015) ("a plaintiff claiming breach of an express warranty [must] give the seller the opportunity to repair or replace the product *before* the exclusive repair and replace remedy is considered to have failed of its essential purpose.") (emphasis in original).

Here, Plaintiffs argue as follows:

> . . . the Complaint alleges that GM refused to repair and replace the failed liftgate struts during warranty service, thus rendering any presentment for repair futile. When compliance with a manufacturer's dispute resolution procedure or exclusive remedy provision would be futile, the requirement may be excused.

Resp. at 6. Plaintiff's argument is self-defeating, and lacks any support in the complaint. If Plaintiffs never presented their vehicles to GM for repair, GM could not have "refused" to repair their vehicles. Plaintiff explains: "[s]pecifically, GM refused to repair or replace defective struts unless a customer had actually experienced strut failure within 90 days of receiving the ineffective software re-flashing that GM offered as part of its 2015 recall." Resp. at 6 (citing Compl. ¶ 51. Paragraph 51 alleges that, in conjunction with the 2015 recall:

> Rather than replace the struts that GM admitted could prematurely wear and fail, the repair was limited to "reflash[ing] the power liftgate actuator motor ECU (Electronic Control Unit) with a new software calibration intended to mitigate the condition." Dealers were instructed to verify that the liftgate stayed up; if it did not, they were instructed to replace the struts. If the struts failed within 90 days of the software upgrade, dealers were instructed to replace them for free "in the interest of customer satisfaction." If they failed after 90 days, it was considered to be a normal maintenance repair for which GM required customers to pay.

Notably, this paragraph only concerns the procedure GM established in conjunction with the 2015 recall. With respect to vehicles presented for repair at other times, the complaint does not allege that the exclusive remedy was a software update followed by a strut replacement within 90 days. Second, Plaintiffs do not allege that they ever gave GM an opportunity to repair or replace their liftgate struts. Rather, Plaintiffs identify a remedy GM selected for other vehicles

during one particular time period (the software update in conjunction with the 2015 recall), allege that the software update failed to correct the problem (for other vehicle owners), and allege that replacement was only available for free within 90 days of the software update. Notably, Plaintiffs do not allege that they ever availed themselves of the opportunity to have their software updated in connection with the recall, or that the software update was ineffective *for their vehicles*. Rather, they allege that there have been a number of consumer complaints to NHTSA, and that these complaints "demonstrate . . . that the software 'fix' GM provided under its recall was ineffective." Compl. ¶ 87. Plaintiff cites to no authority for the proposition that a seller's failure or inability to repair or replace other products similar or identical to the Plaintiffs' product is sufficient to establish that the repair/replace remedy was futile or failed in its essential purpose.

In sum, Plaintiffs ask the Court to speculate that, had Plaintiffs presented their cars for repair, the software update established in conjunction with the 2015 recall would have been the exclusive remedy available, the software update would have been insufficient to permanently cure the defect in their specific vehicles, the defect would have reappeared after the expiration of the 90 day period, Plaintiffs would have presented their vehicles for repair again, and that GM would have refused to repair or replace the liftgate at no charge. Plaintiffs' theory requires a number of hypotheticals ungrounded in *factual* allegations.

Plaintiffs' theory that presenting their vehicles for repair would be futile, or that the repair/replace remedy "failed in its essential purpose," is without merit for an additional reason. As discussed above, Plaintiffs failed to indicate when the liftgate defects first appeared in their vehicles. Irrespective of whether the software update, or any other attempted repair, would have been successful, if the defect did not become apparent during the warranty period, then the defect

would not have been covered by the warranty, and Plaintiffs' futility theory would not rescue their claim.

Because Plaintiffs have not pled facts demonstrating that the alleged defects became apparent during the warranty period, that they presented their vehicles for repair, or that GM was unwilling or unable to repair their vehicles, their state law express warranty claims will be dismissed. The Magnuson-Moss Act claim will be dismissed for the same reason. *See Temple v. Fleetwood Enterprises*, Inc., 133 F. App'x 254, 268 (6th Cir. 2005) ("ultimately, the applicability of the Magunson-Moss Act is directly dependent upon a sustainable claim for breach of warranty . . . Thus, if there exists no actionable warranty claim, there can be no violation of the Magnuson-Moss Act.").

**B.**

Plaintiffs also assert claims for breach of the implied warranty of merchantability pursuant to Mich. Comp. Laws §§ 440.2314, 440.2862 and Mass Gen. Laws ch. 106, §§ 2-314 and 2A-212 (count 4 and 13). Defendant argues that Plaintiff Miller's Michigan implied warranty claim is time barred because the GM Limited Warranty limits the duration of the implied warranty of merchantability to the duration of the express warranty, and that Plaintiffs filed this instant lawsuit after the warranty period had expired. Defendant also argues that Plaintiff Leonard's Massachusetts implied warranty claim is time barred because Plaintiffs commenced this lawsuit more than four years after the date of purchase of their vehicles. In response, Plaintiffs argue that the Michigan implied warranty claim is timely because the claim accrues at the time the breach was discovered or reasonably should have been discovered. Plaintiffs also argue that the Michigan implied warranty claim is tolled because of GM's

fraudulent concealment of the defect, which prevented Plaintiffs from discovering it. Plaintiffs

also argue that the Massachusetts implied warranty claim is timely for largely the same reasons.

### i.

Plaintiff Leonard's Massachusetts implied warranty claim fails because it is time barred.

M.G.L. 106 § 2-725 provides the statute of limitations in contracts for sale:

1) An action for breach of any contract for sale must be commenced *within four years after the cause of action has accrued*. By original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.
2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A *breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.*

(emphasis added). "An implied warranty, by its nature, does not extend to future performance."

*Pagliaroni v. Mastic Home Exteriors, Inc.*, 2018 WL 907401, at *3 (D. Mass. Feb. 15, 2018);

*New England Power Co. v. Riley Stoker Corp.*, 20 Mass. App. Ct. 25, 27 n.4 (1985)). Thus, any

breach of the implied warranty of merchantability occurred when Ms. Leonard purchased her

vehicle in 2012. The cause of action accrued at that time and expired four years later. This case

was not filed until December, 2017. Accordingly, the claim is time barred. This is true

notwithstanding the allegation that Defendant fraudulently concealed its knowledge of the

alleged defect. *See Pagliaroni v. Mastic Home Exteriors, Inc.*, 2018 WL 907401, at *3 (D. Mass.

Feb. 15, 2018) (finding that claim for breach of implied warranty accrued on date of delivery and

expired four years later, and rejecting plaintiff's argument that the limitations period was tolled

by defendants' "fraudulent concealment of its knowledge relating to Oasis's susceptibility to

premature cracking . . .").

**ii.**

The statute of limitations for breaches of implied warranties under the Michigan UCC is identical to that of Massachusetts, as set forth above. *See* MCL § 440.2725. In short, the limitations period is 4 years, the cause of action accrues when the breach occurs, and the breach occurs at the time of delivery unless the warranty explicitly extends to future performance. *Id.* Implied warranties do no extend to future performance. *See Snyder v. Boston Whaler*, Inc., 892 F. Supp. 955, 959 (W.D. Mich. 1994). The parties may, by original agreement, reduce the period of limitations to not less than one year, but may not extend it. *Id.* Pursuant to MCL 440.2316(2), "to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous."

Here, the Limited Warranty provides: "Any implied warranty of merchantability or fitness for a particular purpose applicable to this vehicle is limited in duration to the duration of this written warranty." Limited Warranty at 10, ECF No. 19-4. The duration of the Limited Warranty for 2010 Chevrolet models, such as Plaintiff Leonard's, is 3 years or 36,000 miles, whichever comes first. *Id.* at 2. Thus, the Limited Warranty and implied warranty expired no later than 2013, and were therefore not in effect when Plaintiff Leonard purchased the vehicle in 2014. Notably, Plaintiff does not challenge the validity of the provision in the Limited Warranty limiting the duration of the implied warranty of merchantability to the duration of the Limited Warranty, nor does there appear to be any grounds for challenging that provision. Indeed, the language of the written limitation mentions merchantability, and the written limitation is conspicuous within the document. *See* MCL 440.2316(2).

Plaintiffs rely on MCL § 600.5833, which is not contained within the UCC and which provides that "[i]n actions for damages based on breach of a warranty of quality or fitness the

claim accrues at the time the breach of the warranty is discovered or reasonably should be discovered." Notably, Plaintiffs furnish no case law supporting its argument that MCL § 600.5833, and not MCL § 440.2725 (the UCC provision), provides the applicable statute of limitations for breaches of the implied warranty of merchantability in contracts for the sale of vehicles.

Furthermore, Plaintiff's argument does not address the fact that GM validly shortened the limitations period under MCL 440.2316(2). *See*, *Chaudoin v. Thor Motor Coach, Inc.*, 2017 WL 3485803, at *18 (E.D. Mich. Aug. 15, 2017 (rejecting the plaintiff's argument that its claim was timely under MCL § 600.5833 notwithstanding MCL § 440.2725, because the question of which statutory provision was applicable "does not affect the ultimate question of whether [Defendant] validly shortened the limitations period."). Because GM validly shortened the limitations period of any implied warranties to the duration of the Limited Warranty, and because the Limited Warranty expired before Plaintiff Miller purchased her vehicle, her claim for breach of the implied warranty of merchantability fails.

Plaintiffs also argue that the limitations period should be tolled because of Defendant's fraudulent concealment in failing to "publically disclose the defective Stabilus struts." Resp. at 7-8 (citing MCL § 600.5855). In order to toll the statute of limitations, however, "[t]he plaintiff must prove that the defendant committed affirmative acts or misrepresentations that were designed to prevent subsequent discovery. Mere silence is insufficient." *Sills v. Oakland Gen. Hosp.*, 220 Mich. App. 303, 310, (1996). Plaintiffs do not allege any affirmative acts or misrepresentations, but rather alleges that GM failed to disclose the defect. Accordingly, Plaintiff Miller is not entitled to toll the limitations period.

Furthermore, irrespective of statute of limitations considerations, Plaintiff Miller has not stated a claim for breach of the implied warranty of merchantability, because she has alleged no facts establishing that the vehicle was not merchantable at the time of purchase. MCL 440.2314 provides, in relevant part, that merchantable goods must be at least such as: "a) pass without objection in the trade under the contract description; and . . . c) are fit for the ordinary purposes for which such goods are used." Under Count 4 (Michigan implied warranty) Plaintiffs allege as follows:

> 184. The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used.

Compl. ¶ 184. This conclusory assertion that the goods did not comply with the statutory definition of "merchantable goods" adds no substance to Plaintiff Miller's implied warranty claim as it contains no factual allegations. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 ("formulaic recitation of the elements of a cause of action will not do."); (2007 *See State v. CVS Caremark Corp.*, 496 Mich. 45, 63; 852 NW2d 103 (2014). ("conclusory statements that are unsupported by allegations of fact on which they may be based will not suffice.").

Plaintiffs proceed to explain that "the ordinary purpose of the Class Vehicles is the safe transportation of goods. The Power Liftgate Defect renders the Class Vehicles unfit for this purpose." *Id.* ¶ 185. The Power Liftgate Defect is explained in the complaint as follows:

> power liftgate struts that prematurely wear because the design allows dirt and debris to compromise the seals on the pressurized cylinder, allowing pressurized gas to escape (the "Power Liftgate Defect"). Rather than gradually losing the ability to support the liftgate, these struts fail without warning, causing injury to anyone in the path of the liftgate and hindering the owners' ability to use their rear compartment because the liftgate will not remain open.

Compl. ¶ 2. In contrast to Plaintiffs Leonard, Luse, and Arnadi, however, Plaintiff Miller does not allege that her liftgate failed, hindered her ability to use the rear compartment, or otherwise malfunctioned in any way. Rather, she simply asserts that she "owns a 2010 Chevrolet Traverse with the Power Liftgate Defect." Compl. ¶ 19. At most, Plaintiff Miller alleges that her liftgate struts are prone to premature wear. However, she does not allege that this susceptibility to "premature wear" manifested itself during the 3-4 years she has owned the vehicle or otherwise interfered with the vehicle's ability to perform its "ordinary purpose of . . . safe transportation of goods." Considering the complaint as a whole, the allegations are insufficient to state a claim that GM breached the implied warranty of merchantability with respect to Plaintiff Miller's vehicle.

## C.

### i.

Plaintiffs also assert five counts of common law fraudulent omission on behalf of the Michigan, Illinois, Massachusetts, Oregon, and Washington classes (count 5, 9, 14, 18, and 22). Plaintiffs allege that GM was aware of the power liftgate defect when it marketed and sold the Class Vehicles, that GM failed to fulfill their duty to disclose the existence of the power liftgate defect to the Plaintiffs, and that Plaintiffs relied on this omission of a material fact when purchasing their vehicles. Plaintiffs allege that they would have not purchased the vehicles, or would have paid less for them, had they been aware of the power liftgate defect.

Defendant argues that Plaintiffs allegations fail to meet the heightened pleading standard of rule 9(b) because Plaintiffs fail to allege that they relied upon any communication from GM when making their purchasing decision. Mot. at 13-15 (citing Fed. R. Civ. P. 9(b)). Defendant argues that Plaintiffs fail to allege facts demonstrating that GM owed them a duty to disclose but

rather allege that they purchased their vehicles from independent GM dealerships or third parties and never had any direct communications with GM. *Id.* at 16-17. Finally, Defendant argues that Plaintiff has not sufficiently alleged that GM had knowledge of the defect and that such knowledge would still be insufficient to create a duty to disclose because GM did not negotiate, let alone communicate, directly with Plaintiffs and was not a party to the underlying contract. *Id.*

Plaintiffs argue that they have adequately pled a claim for fraudulent omission, which is a claim requiring a more relaxed pleading standard than that for fraudulent misrepresentation. Resp. at 10-11. Plaintiffs argue that they have no obligation to plead reliance on specific advertisements or representations to support a claim for fraudulent omission. *Id.* at 12. Finally, Plaintiffs argue that the substantive state law governing their fraudulent omission claims imposes a duty on manufacturers with superior information regarding defects that pose a safety risk to disclose the existence of those safety defects if the defects are not readily ascertainable to customers. *Id.* at 13.

**ii.**

> [T]he textbook elements of a fraud action that appear to be reflected in the substantive law of all or almost all jurisdictions are: (1) the defendant has made a false representation of or failed to disclose a material fact; (2) the defendant has knowledge of or a belief in the falsity of the statement by the person making it: (3) a belief in the truth of the false statement or the completeness of the representations by the person to whom the representation is made; (4) an intent on the part of the defendant that the statement or the failure to disclose should be acted upon by the plaintiff; and (5) the detrimental reliance upon the false representation or the fullness of the disclosure by the person claiming to have been deceived.

§ 1297 Pleading Fraud With Particularity—In General, 5A Fed. Prac. & Proc. Civ. § 1297 (3d ed.) (collecting cases).

For claims alleging fraud, rule 9(b) imposes a heightened pleading standard which requires that the complaint set forth with particularity "the time, place, and content of the alleged

misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud. *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 551 (6th Cir. 2012). The Sixth Circuit has observed that rule 9(b)'s "particularized" allegation requirement may demand different things in different contexts." *United States v. Walgreen Co.*, 846 F.3d 879, 880–81 (6th Cir. 2017). "The specificity required for allegations of affirmative misrepresentations is necessarily different than the specificity required for allegations of fraudulent omissions. *In re Duramax Diesel Litig.*, 2018 WL 949856, at *9 (E.D. Mich. Feb. 20, 2018) (emphasis added). "When it comes to claims of fraud by omission or fraudulent concealment, the plaintiff faces a *slightly* more relaxed pleading burden; the claim 'can succeed without the same level of specificity required by a normal fraud claim.' " *Beck v. FCA US LLC*, 273 F.Supp.3d 735, 751 (E.D. Mich. 2017) (quoting *Baggett v. Hewlett–Packard Co.*, 582 F.Supp.2d 1261, 1267 (C.D. Cal. 2007) (emphasis added).

Even in the context of a fraudulent omission, claim however, rule 9(b) requires a plaintiff to set forth "the who, what, when, where, and how" of the alleged omission. *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 256 (6th Cir. 2012). Thus, a plaintiff must set forth (1) precisely what was omitted; (2) who should have made a representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what [defendant] obtained as a consequence of the alleged fraud. *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 256 (6th Cir. 2012). To state a claim for fraudulent omission, a plaintiff must also establish a duty to disclose. *MacDonald v. Thomas M. Cooley Law Sch.*, 724 F.3d 654, 665 (6th Cir. 2013).

Here, Plaintiffs Miller, Graham, and Leonard have not stated a claim for fraudulent omission because they have not alleged an omission of material fact that they detrimentally relied upon. Plaintiffs contend that:

> [t]he Complaint clearly alleges that GM knew of the Power Liftgate Defect, knew that it was a material safety concern, and that GM intentionally concealed the Power Liftgate Defect, including by omitting this defect from all of its advertisement and representations concerning the benefits of the power liftgate and the dependability of the Class Vehicles, with the intent of influencing Plaintiffs' purchasing decisions . . . Plaintiffs have each alleged that they relied on GM to disclose known material defects, which it did not do, and that had Plaintiffs been aware of the Power Liftgate Defect, they would not have purchased the Class Vehicles or would have paid less for them.

Resp. at 11 (citing Compl. ¶¶ 37-112, 195-96). Thus, according to Plaintiffs, GM's fraudulent conduct was the omission of the fact that the vehicles suffered from "the Power Liftgate Defect," and that Plaintiffs relied on this omission to their detriment. "The Power Liftgate Defect" is described as "struts that prematurely wear because the design allows dirt and debris to compromise the seal on the pressurized cylinder, allowing pressurized gas to escape."). Compl. ¶ 2. The liftgates "unexpectedly fail," and "suddenly fall" on people attempting to access the rear compartment, causing injury to anyone in its path. *Id.* ¶ 1-2.

In contrast to the other Plaintiffs however, Plaintiffs Miller and Graham do not allege that this defect ever manifested itself in their vehicles. They allege no malfunction in their liftgates at all. *Id.* ¶18-23. Plaintiff Leonard alleges that "her powered liftgate struggled to open and required manual assistance." *Id.* ¶ 26. She does not, however, alleged that her liftgate ever fell without warning. In short, Plaintiffs contend that GM should have informed them that their struts would prematurely wear, thereby compromising the seal on the pressurized cylinder and causing the liftgate to fail without warning and suddenly drop. However, Plaintiffs Miller, Graham, and Leonard do not allege that their vehicle has ever malfunctioned in this fashion. Thus, they fail to

establish that they suffered any detriment connected to GM's alleged failure to disclose the Power Liftgate Defect.

Plaintiffs Luse and Arnadi, on the other hand, do allege that their liftgates fell without warning. *Id.* ¶ 30, 34. The parties disagree, however, as to whether GM had a duty to disclose the defect under Washington or Oregon law. GM contends it had no duty to disclose because GM was not a party to the contract between Plaintiffs and the dealerships, GM did not negotiate with Plaintiffs, and GM was not in a fiduciary or confidential relationship with Plaintiffs. Mot. at 16 (citing *Simpson v. US W. Commc'ns, Inc.*, 957 F. Supp. 201, 206 (D. Or. 1997) ("A duty to disclose exists when the parties are in a fiduciary [] or possibly a special relationship") (internal citation and punctuation omitted); *Tokarz v. Frontier Fed. Sav. & Loan Ass'n*, 656 P.2d 1089, 1094 (Wash. Ct. App. 1982) ("Ordinarily, the duty to disclose a material fact exists only where there is a fiduciary relationship").

Plaintiffs do not allege a fiduciary relationship with GM, but nevertheless contend that GM had a duty to disclose the existence of a known safety risk. Resp. at 13 (citing *Carideo v. Dell, Inc.*, 706 F. Supp. 2d 1122, 1133 (W.D. Wash. 2010) (under Washington law, when "a manufacturer has superior information regarding defects that are not readily ascertainable to customers, it has a duty to disclose that information" (quoting *Zwicker v. Gen. Motors Corp.*, 2007 WL 5309204, at *4 (W.D. Wash. July 26, 2007))); *CRM Collateral II, Inc. v. Tri-County Metropolitan Transp. Dist. of Or.*, 2009 WL 3054959, at *5 (D. Or. Sept. 18, 2009) (under Oregon law, a party must disclose facts that are "objectively material" to the decision to enter into a transaction (citing *Milliken v. Green*, 283 Or. 283, 285-86 (1978)). Other than providing a footnote containing a few jurisdiction specific citations, the parties devote little attention to briefing the question of whether and under what circumstances a manufacturer has a duty to

disclose the existence of a known safety defect to customers. For the purposes of the instant motion, however, the Court need not investigate the precise parameters of a manufacturer's duty to disclose known safety defects. This need not be explored because it is apparent that Plaintiffs have not alleged that GM had any knowledge prior to the date Plaintiffs Luse and Arnadi purchased their vehicles that those vehicles contained a safety defect.

Knowledge may be alleged "generally" under rule 9(b). However, the fact that knowledge and intent allegations are not subject to heightened pleading standards does not give Plaintiffs "license to evade the less rigid—though still operative—strictures of Rule 8." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The complaint contains a number of conclusory allegations including that "GM failed to disclose the Power Liftgate Defect to [Plaintiff] before she purchased her vehicle, despite GM's knowledge of the defect . . ." and that "GM was aware of the Power Liftgate Defect within the Class Vehicles when it marketed and sold the Class Vehicles." Compl. ¶ 20, 192. These allegations are recited for each Plaintiff and under each count of fraudulent omission. These allegations are plainly insufficient to establish knowledge even under the liberal pleading standard of rule 8. Notably, Plaintiffs make no attempt to explain how the remainder of the complaint, construed as a whole, supports its conclusion that GM had knowledge of a safety defect at the time the vehicles were purchased.

Plaintiffs allege that GM knew of the Power Liftgate Defect "since at least 2010, when it issued the first of its TSBs" and "likely had notice and knowledge of the defects prior to 2010" based on recalls by other automakers who used liftgate struts from the same supplier. Compl. ¶ 6. Plaintiffs also allege that GM "should have been aware that the Stabilus struts have a long history of defects" based on recalls issued by Ford, Toyota, and Honda. Compl. ¶ 58. These allegations do not contain sufficient factual information to establish that GM had knowledge of a

safety defect prior to 2010. The connection between GM's knowledge of a safety defect and various recalls by different auto manufacturers of struts from the "same supplier" used by GM is tenuous at best, and Plaintiff makes no attempt to bridge the gap between those recalls and GM's alleged knowledge of a safety defect prior to 2010. Furthermore, Plaintiffs do not appear convinced that GM did in fact have knowledge prior to 2010. Indeed, they do not make that allegation in their complaint. Rather, Plaintiffs tentatively allege that GM "likely" had knowledge or "should have been aware." Compl. ¶¶ 6, 58.

Nor do Plaintiffs allege sufficient factual matter to establish the GM had knowledge of a safety defect at the time Plaintiff Arnadi purchased his vehicle in 2012, or Plaintiff Luse purchased his vehicle in 2013. The complaint alleges as follows:

> In July 2010, GM issued a TSB notifying dealers, but not owners, of multiple problems that could occur with the power liftgates *in the subsequently recalled vehicles*, including that "[p]ower liftgate closes immediately after fully opening. Usually has a loud clunking noise at top of gate travel just before power closing. A customer and/or technician may comment that when using the power liftgate, it will open fully, drop a few inches, then power close." The cause— which GM identified—was weak struts, which puts the power liftgate into "consumer safe mode and power close the gate slowly." If the liftgate would not remain open, the dealer was instructed to replace the struts

Compl. ¶ 44 (emphasis added). This paragraph alleges that the 2010 TSB concerned liftgates in "the subsequently recalled vehicles." The "subsequently recalled vehicles included "2007 to 2012 General Motors Corp. (GMC) Acadia, 2008 to 2012 Buick Enclave, 2007 to 2010 Saturn Outlook, and 2009 to 2012 Chevrolet Traverse." *Id.* ¶ 48. The "subsequently recalled vehicles" did not, however, include Plaintiff Luse's 2011 GMC Terrain and Plaintiff Arnadi's 2012 Chevy Equinox. Thus, Plaintiff Luse and Arnadi's vehicles were not subject to the 2010 TSB. Rather, according to paragraph 47, Plaintiff Luse and Arnadi's vehicles were subject to the March 2014

TSB, which does not establish GM's knowledge of any defect in those vehicles as of 2010, much less a safety defect.

Furthermore, the 2010 TSB does not establish GM's knowledge of a *safety* defect, even with respect to 4 models that were subject to that TSB. The 2010 TSB reflected the following defects:

> "[p]ower liftgate *closes immediately after fully opening*. Usually has a loud clunking noise at top of gate travel just before power closing. A customer and/or technician may comment that when using the power liftgate, it will open fully, *drop a few inches, then power close*." The cause— which GM identified—was weak struts, which puts the power liftgate into "*consumer safe mode and power close the gate slowly*." If the liftgate would not remain open, the dealer was instructed to replace the struts.

Compl. ¶ 44 (emphasis added). In contrast to the defects reflected in the 2010 TSB, Plaintiffs Luse and Arnadi allege that their liftgates unexpectedly "collapsed" on multiple occasions, once striking Mr. Luse on the shoulder, and once "smash[ing] Mr. Arnadi into the vehicles rear bumper," forcing him to "use his back to raise the liftgate and free himself." Compl. ¶ 44 The defects noted in the 2010 TSB are much more benign, namely liftgates that "drop a few inches" or enter "consumer safe mode and power close the gate slowly." These defects are not equivalent to "collaps[ing]" and "smash[ing]" into owners and pinning them against the rear bumper. The 2010 TSB does not establish that GM knew in 2010 that any of its vehicles posed a safety risk to customers.

The complaint also alleges that, "by the end of 2012," the NHTSA "had received at least 28 reported complaints of sudden falls of power liftgates in GM vehicles, including nine complaints related to vehicles that GM later recalled." Compl. ¶ 85. Plaintiffs do not allege, however, that these complaints concerned the 2011 GMC Terrain or the 2012 Chevy Equinox (Plaintiff Luse and Arnadi's vehicles).

Plaintiffs allege that "GM limited its 2015 recall to four models, despite knowing that other models contained the same or similar struts and were the subject of consumer complaints and TSBs." *Id.* ¶ 10. Plaintiffs do not allege which TSBs they are referring to, the dates those TSBs were issued, and which makes and models the TSBs covered.

In sum, the allegations in the complaint fail to establish that GM had knowledge prior to the date Plaintiffs Luse or Arnadi purchased their vehicles that the liftgates on those vehicles posed a safety hazard to consumers.

### D.

Plaintiffs also assert five counts under state consumer protection statutes: the Michigan Consumer Protection Act, Mich. Comp. Laws §§ 445.901-445.922 (count 2); the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq.* (count 7), the Massachusetts Regulation of Business Practices for Consumer Protection Act, Mass Gen. Laws ch. 93A, §§ 1, *et seq.* (count 11), the Oregon Unlawful Trade Practices Law, Or. Rev. Stat. §§ 646.605, *et seq.* (count 16), and the Washington Consumer Protection Act, Wash. Rev. Code §§ 19.86.010, *et seq.* (Count 20). Plaintiffs allege that GM engaged in deceptive and unfair business practices by intentionally and knowingly omitting information regarding the liftgate defect, which were material facts that a reasonable person would have considered in deciding whether to purchase the vehicles and how much to pay for them.

Rule 9(b) applies to state consumer protection claims "which sounds in fraud." *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013). The parties do not appear to dispute this point, though Plaintiffs note that "[t]he specificity required for allegations of affirmative misrepresentations is necessarily different than the specificity required for allegations of fraudulent omission." Resp. at 15 (citing *Duramax*, 2018 WL 949856, at *9).

It is apparent from the complaint and Plaintiffs' response brief that the factual allegations underlying the state consumer protection claims are essentially identical to the factual allegations underlying the fraudulent omissions claims. Indeed, in explaining what deceptive/unfair conduct GM engaged in that Plaintiffs believe is actionable under the state consumer protection statutes, Plaintiffs explain "Plaintiffs Miller, Leonard, Luse, and Arnadi have sufficiently stated omissions claims under the laws of Michigan, Massachusetts, Oregon, and Washington, respectively, because they have alleged that the Power Liftgate Defect, concealed by GM, is a safety risk that they could not have reasonably discovered, and which affected their decisions to purchase their vehicles." *Id.* at 17-18. Thus, Plaintiffs essentially reassert their claim for fraudulent omission, and contend that fraudulent omission is also actionable under the state consumer protection statutes. For the same reasons explained above, however, Plaintiffs have not stated fraudulent omissions claims. Thus, their allegations of fraudulent omission cannot support their state consumer protection claims.

**E.**

Finally, Plaintiffs assert five counts of unjust enrichment on behalf of the Michigan, Illinois, Massachusetts, Oregon, and Washington classes (count 6, 10, 15, 19, and 23). In each of these counts Plaintiffs allege that GM has wrongfully benefitted from knowingly selling and leasing defective vehicles at inflated prices due to GM's concealment of the liftgate defect, that it is inequitable and unconscionable for GM to retain these benefits, and that the amount of the unjust enrichment should be disgorged and returned to Plaintiffs.

Defendant argues as follows: 1) that applicable state law prohibits unjust enrichment claims where there is an express contract; 2) that Plaintiffs cannot pursue the equitable remedy of unjust enrichment where legal remedies are available; and 3) that Plaintiffs have no claim for

unjust enrichment because they did not engage in any direct transaction with GM and thus did not confer any benefit directly on GM. Mot. at 22-24. Plaintiffs respond that: 1) under rule 8(d), they can plead unjust enrichment and express warranty claims alternatively; 2) that GM disputes that it was a party to an agreement with Plaintiffs; and 3) that Plaintiffs did directly confer a benefit on GM.

The elements of the quasi-contractual claim of unjust enrichment are a benefit conferred, awareness by the recipient that a benefit has been received and, under the circumstances, it would be unjust to allow retention of the benefit without requiring the recipient to pay for it. *Arnett v. Bank of Am., N.A.*, 874 F. Supp. 2d 1021, 1035 (D. Or. 2012).

For the same reasons discussed above, Plaintiffs Miller, Graham, and Leonard have not alleged that they experienced a malfunction with their vehicle connected to the "Power Liftgate Defect." Accordingly, they have not stated a claim that GM was unjustly enriched at their expense.

Plaintiffs Luse and Arnadi's unjust enrichment claims also fail because the terms of the GM Limited Warranty governs the parties' rights and obligations with respect to defects in materials and workmanship, and thus no contract will be implied in law to defeat the GM Limited Warranties' express terms. There "cannot be a valid legally enforceable contract and an implied contract covering the same services." *Prestige Homes Real Estate Co. v. Hanson,* 151 Or.App. 756, 762, 951 P.2d 193 (1997). *Arnett v. Bank of Am., N.A.*, 874 F. Supp. 2d 1021, 1035 (D. Or. 2012). "A party to a valid express contract is bound by the provisions of that contract, and may not disregard the same and bring an action on an implied contract relating to the same matter, in contravention of the express contract." *Chandler v. Washington Toll Bridge Auth.*, 17 Wash. 2d 591, 604, 137 P.2d 97, 103 (1943).

Plaintiffs rely on rule 8(d), which provides that a party may set out multiple claims or defenses alternatively, and the pleading is sufficient if any one of those claims or defenses is sufficient. Fed. R. Civ. P. 8(d). Simply put, rule 8(d) is no help to Plaintiffs because neither Plaintiffs' warranty claims nor unjust enrichment claims are sufficient. As noted above, with respect to Plaintiffs claims for breach of the GM Limited Warranty, irrespective of whether the GM Limited Warranty is construed as a contractual promise to repair/replace or an express warranty under the UCC, Plaintiffs fail to allege facts demonstrating that the GM Limited Warranty was breached. Thus, Plaintiffs' express warranty claims fail not because no such promise to repair/replace exists, but rather because they have alleged no breach of the warranty. Plaintiffs' unjust enrichment claim fails not because they pled an alternative claim for breach of the GM Limited Warranty, but rather because the GM Limited Warranty is an agreement between Plaintiffs and GM which governs the same subject matter as the unjust enrichment claims. Plaintiffs argue that "GM has not admitted that it is party to an agreement with Plaintiffs, and has disputed whether its express warranty applies to Plaintiffs' claims." Resp. at 23. Irrespective of the fact that GM was not a party to the underlying sales contract between Plaintiffs and the dealerships, it cannot be disputed that the GM Limited Warranty is an agreement between GM and its customers. Such is the very nature of a manufacturer's warranty. Indeed, the first page of the warranty, entitled "Important Message to Owners," reads: "GM is committed to assuring satisfaction with your new vehicle." ECF No. 19-3. Thus, the unjust enrichment claims fail.

## V.

For the foregoing reasons, Plaintiffs' complaint will be dismissed without prejudice. Plaintiffs will be granted 30 days to file a motion to amend their complaint. If Plaintiffs choose

not to seek leave to amend within the 30 day time period, the complaint will be dismissed with prejudice and judgment will be entered for the Defendant.

**VI.**

Accordingly, it is **ORDERED** that Defendant's motion to dismiss, ECF No. 19, is **GRANTED**.

It is further **ORDERED** that the complaint, ECF No. 1, is **DISMISSED** without prejudice.

It is further **ORDERED** that Plaintiffs may file a motion to amend by **July 9, 2018**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: June 7, 2018

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 7, 2018.

s/Kelly Winslow
KELLY WINSLOW, Case Manager

---